**UNITED STATES of America,
Petitioner,**

v.

**Wayne HUNT, Respondent.**

**Civil Action No. 07–12063–JLT.**

United States District Court,
D. Massachusetts.

Aug. 18, 2009.

Eve A. Piemonte–Stacey, Mark J. Grady, Mark T. Quinlivan, Jennifer C. Boal, Jennifer A. Serafyn, U.S. Attorney's Office, Boston, MA, for Petitioner.

John G. Swomley, Swomley & Associates, Syrie D. Fried, Ian Gold, Timothy G. Watkins, Federal Defender's Office, Boston, MA, for Respondent.

## MEMORANDUM

TAURO, District Judge.

### I. Introduction

Petitioner, the United States of America ("the Government"), instituted this civil ac-

tion on March 9, 2007, seeking to commit Respondent Wayne Hunt as a "sexually dangerous person" pursuant to the Adam Walsh Child Protection and Safety Act of 2006 ("the Act").[1] The Government's Petition states that mental health personnel for the federal Bureau of Prisons ("BOP") have examined Respondent and issued a preliminary determination that he is sexually dangerous. Upon receipt of the Petition, the Act required this court to stay Respondent's release from federal custody pending a hearing to determine whether Respondent qualifies for commitment as a sexually dangerous person.

To commit Respondent, the Government must prove by clear and convincing evidence that he is a sexually dangerous person, which the Act defines as "a person who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others."[2] An individual is "sexually dangerous to others" under the Act if he "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released."[3]

This court held a five-day bench trial on this matter beginning on April 27, 2009. At the conclusion of trial, Parties submitted proposed findings of fact and conclusions of law. After considering the testimony at trial, the evidentiary record, and Parties' submissions, this court concludes Respondent is a sexually dangerous person within the meaning of the Act. In support of this decision, this court issues the following findings of fact and conclusions of law.

## II. Findings of Fact

### A. Personal History

Born in 1946, Respondent was adopted when he was eighteen months old and grew up as an only child.[4] Respondent never felt quite at home with his adoptive parents, particularly his physically abusive mother.[5] He reports that his mother was manic-depressive and frequently hit him with coat hangers.[6] Respondent had a warmer relationship with his father, but the relationship came to an early close with the father's passing when Respondent was fourteen or fifteen years old.[7]

In addition to troubles with his adoptive mother, Respondent experienced abuse at the hands of an uncle who lived next door. The uncle reportedly forced Respondent to engage in oral and anal sex on more than one hundred occasions while Respondent was between the ages of seven and twelve.[8] Between the ages of ten and fourteen, Respondent also suffered abuse by a minister and by adult men at a nearby yacht club.[9]

Following his father's death, Respondent began having disciplinary problems, including running away from home, performing poorly in school, experimenting with drugs, lying, stealing, and breaking and entering.[10] Later in life, Respondent admitted to several suicide attempts after his father's death.[11] At age fifteen, Re-

---

1. 18 U.S.C.A. § 4248 (West 2009).

2. *Id.* § 4247(a)(5).

3. *Id.* § 4247(a)(6).

4. Joint Ex. 1 at 1; Joint Ex. 3 at 2.

5. Joint Ex. 9 at 3.

6. Joint Ex. 1 at 1–2; Joint Ex. 3 at 2.

7. Joint Ex. 1 at 2; Joint Ex. 3 at 2.

8. Joint Ex. 3 at 2.

9. *Id.*

10. Joint Ex. 1 at 2; Joint Ex. 3 at 4.

11. Joint Ex. 3 at 4.

spondent was admitted to a residential treatment facility, where he was diagnosed with "Disorders of Psychogenic Origin, Primary Behavior Disorder in Children, and Conduct Disturbance."[12] Respondent displayed schizoid characteristics but "never exhibited any psychotic symptoms."[13]

After completing the tenth grade, Respondent dropped out of school and enlisted in the Navy.[14] Military records indicate that he was discharged following a sentence of six months of hard labor for Desertion, Breaking Restriction, and Refusal to Follow a Lawful Order.[15] Some records indicate Respondent received a bad conduct discharge, but Respondent's official papers describe his discharge as honorable.[16]

After leaving the military, Respondent became licensed as an electrician.[17] Respondent spent much of his career working for carnivals as an electrician.[18] He worked for carnivals on a seasonal basis, spending many of his winters self-employed as a marine mechanic.[19] His longest period of employment in a single position was as a master electrician in Louisiana.[20]

Between the ages of eleven and thirteen, Respondent began dating same-age peers and experimenting with homosexual and heterosexual behavior.[21] At age nineteen, Respondent began a fifteen-year, on-and-off relationship with a woman named Brenda.[22] The two attempted living together and had two daughters, but their relationship was "fraught with arguments and dissatisfaction."[23] Respondent admits he was involved with young boys during his time with Kathy,[24] and Kathy became increasingly resentful of his absences from home.[25] Respondent ultimately terminated the relationship when Kathy allegedly stole $7000 to pay for the birthday party of one of their daughters.[26] Respondent reports having a few sexual encounters with other peer-aged men and women as an adult, but he did not consider them serious relationships.[27]

### B. Criminal and Sexual Offense History

Respondent's nonsexual criminal history dates back to his military incarceration for Desertion in 1964. Soon after his release from military service, Respondent was arrested for Breaking and Entering on March 30, 1966 in Hartford, Connecticut, but those charges were ultimately dismissed.[28] On December 28, 1966, Respondent was arrested and charged with Burglary, but the record does not reveal a disposition for that charge.[29] In 1967, Respondent spent thirty days in jail for Writ-

12. *Id.*

13. *Id.*

14. *Id.* at 2.

15. Joint Ex. 1 at 3.

16. *Id.*

17. Joint Ex. 5 at 9; Joint Ex. 3 at 3.

18. Joint Ex. 5 at 9.

19. *Id.* at 9–10.

20. Joint Ex. 3 at 3.

21. Joint Ex. 1 at 2; Joint Ex. 3 at 3.

22. Joint Ex. 1 at 2.

23. *Id.*

24. Joint Ex. 3 at 3.

25. Joint Ex. 5 at 10.

26. Joint Ex. 1 at 3; Joint Ex. 5 at 10.

27. Joint Ex. 3 at 3.

28. *Id.* at 4; Joint Ex. 5 at 12; Joint Ex. 9 at 5.

29. Joint Ex. 3 at 4; Joint Ex. 5 at 12; Joint Ex. 9 at 5.

ing a Fraudulent Check.[30] On August 8, 1970, Respondent was charged with Being a Fugitive, but no disposition is apparent in the record.[31] And on September 1, 1970, Respondent was charged with Grand Larceny and received a conditional discharge.[32]

According to Respondent, he first experienced pedophilic sexual interest when he was in his twenties.[33] Respondent committed his first known sexual offense at age twenty-seven, when he engaged in mutual oral sex with an eleven- to twelve-year-old boy whom he met at a mall in California.[34] On multiple occasions that same year, Respondent engaged in mutual masturbation with a fourteen-year-old male whom he met at a carnival.[35] Respondent was never arrested or charged for these earliest known offenses.

Respondent's first arrest for a sexual offense occurred in California on June 4, 1973. At a probable cause hearing, two eleven-year-old victims, D.W. and J.C.,[36] testified that Respondent kissed them and fondled their penises after meeting them at a carnival on June 3, 1974.[37] Respondent was charged with two felony counts of lewd and lascivious acts upon a child under the age of fourteen, but he pleaded guilty to a single count of a lesser included misdemeanor offense and was placed on probation.[38] Respondent later admitted performing oral sex on one of the boys and fondling the other boy through his clothing.[39]

After being placed on probation, Respondent moved to Louisiana.[40] Having left California, Respondent ceased reporting to probation, and a bench warrant was issued for his arrest.[41] In Louisiana, Respondent, now twenty-nine years old, began working as a karate instructor for twelve- to sixteen-year-old boys.[42] While working in this capacity, Respondent sexually molested four to six adolescent boys.[43] Police records indicate that in 1975, Respondent had three charges of Aggravated Rape, six charges of Indecent Behavior with a Juvenile, and one charge of Aggravated Crime Against Nature pending in Terrebone Parish, Louisiana, but apparently these charges were never pursued.[44] Respondent admits performing oral sex on these victims.[45]

On June 1, 1975, Respondent was arrested in South Holland, Illinois and charged with Indecent Liberties with a Child.[46] The circumstances of this arrest are unknown, but Respondent denies any misconduct in relation to the incident.[47]

---

**30.** Joint Ex. 3 at 4; Joint Ex. 5 at 12; Joint Ex. 9 at 5.

**31.** Joint Ex. 3 at 4; Joint Ex. 5 at 12.

**32.** Joint Ex. 3 at 4; Joint Ex. 5 at 12; Joint Ex. 9 at 5.

**33.** Joint Ex. 5 at 11.

**34.** Gov't Ex. O at 1; Joint Ex. 3 at 10; Trial Tr. 49:6–9, Apr. 27, 2009 ("Apr. 27 Tr.").

**35.** Gov't Ex. O at 1; Joint Ex. 3 at 10; Apr. 27 Tr. 49:10–13.

**36.** Pursuant to Local Rule 5.3(A)(2), minor victims are identified by their initials.

**37.** Gov't Ex. O at 1.

**38.** *Id.*; Joint Ex. 3 at 11.

**39.** Gov't Ex. O at 1; Joint Ex. 3 at 10–11; Apr. 27 Tr. 49:24–50:2.

**40.** Joint Ex. 3 at 11.

**41.** Gov't Ex. O at 2–3; Apr. 27 Tr. 51:12–52:6.

**42.** Apr. 27 Tr. 53:24–54:3.

**43.** Gov't Ex. O at 2; Apr. 27 Tr. 54:2–7.

**44.** Gov't Ex. O at 2; Joint Ex. 3 at 8.

**45.** Joint Ex. 3 at 11.

**46.** Gov't Ex. O at 2; Joint Ex. 9 at 5.

**47.** Gov't Ex. O at 2; Joint Ex. 9 at 5.

Around this same period, Respondent spent some time in Sacramento, where he admits "picking up young male prostitutes."[48] After being arrested "a few times" in Sacramento, Respondent moved to New Orleans, where he lived on a boat and sought out more "male prostitutes."[49] Respondent states, "Of course, I was looking for underage previously abused children and I found them."[50]

Between January 1976 and September 1976, Respondent estimates that he had masturbatory practices with fifteen to twenty different boys, and up to twenty-five times with the same boy.[51] On August 4, 1976, Respondent kidnapped a twelve-year-old boy, K.J.T., in Louisiana and took him out of state for a five-week period.[52] Respondent admits that he committed the crime with the intention of having sex with K.J.T., but denies having any sexual contact with him.[53] Respondent had a firearm in his possession during the course of the kidnapping, but he claims that the gun was unloaded and never displayed before K.J.T.[54] Respondent was arrested for the kidnapping on September 16, 1976 and entered a guilty plea in federal court on February 14, 1977.[55] He was initially sentenced to a life term, but the judge reduced his sentence to ten years

imprisonment based on the victim's own statement.[56] After serving less than five years of the sentence in prison, Respondent was released on parole.[57]

After his release from federal custody in 1981, Respondent moved to New York, where he continued to seek out young boys for sex.[58] Between 1982 and 1985, Respondent molested over a dozen children between the ages of seven and fourteen.[59]

Respondent began living with his seven-year-old relative, G.D., in the summer of 1982.[60] Over the next three years, Respondent subjected the boy to repeated oral and anal sex, taking photographs of the abuse.[61] According to Respondent, "[t]here is no telling how many times we had sex. In [G.D.]'s case at least some type of abuse daily."[62]

In October 1982, Respondent began molesting nine-year-old J.Z.[63] The abuse continued for three years, during which time Respondent repeatedly forced J.Z. to engage in oral and anal sex, to photograph Respondent's sexual abuse of other boys, and to bring other boys for Respondent to abuse.[64]

That same year, Respondent began abusing nine-year-old H.R., whom he also molested repeatedly over a period of approximately three years.[65] Respondent

---

48. Joint Ex. 23 at HU01368.

49. *Id.*

50. *Id.*

51. Gov't Ex. O at 2; Apr. 27 Tr. 57:6–10.

52. Apr. 27 Tr. 59:21–60:4.

53. Gov't Ex. O at 3; Joint Ex. 3 at 11; Apr. 27 Tr. 60:5–8.

54. Gov't Ex. O at 3; Apr. 27 Tr. 58:22–59:3.

55. Gov't Ex. O at 3.

56. *Id.*; Joint Ex. 3 at 11; Apr. 27 Tr. 60:22–25.

57. Gov't Ex. O at 3; Apr. 27 Tr. 61:17–18.

58. Gov't Ex. O at 3; Joint Ex. 3 at 11.

59. Gov't Ex. O at 4.

60. *Id.* at 3; Joint Ex. 3 at 11.

61. Gov't Ex. O at 3; Joint Ex. 3 at 11.

62. Gov't Ex. O at 3; Apr. 27 Tr. 67:21–22.

63. Gov't Ex. O at 3–4.

64. *Id.* at 4.

65. *Id.*; Joint Ex. 3 at 11.

admits coercing H.R. into mutual masturbation, and oral and anal sex.[66] H.R. also photographed other boys in sex acts under Respondent's direction.[67] Respondent even forced H.R. to have sex with his seven-year-old brother J.R.[68]

During this same time period, Respondent began abusing twelve-year-old L.A. and fourteen-year-old H.D.[69] Respondent engaged in anal and oral sex with both boys and photographed them performing sexual acts.[70]

Respondent has identified eight other victims from this period whom he met at a mall.[71] He frequented the mall, seeking out boys in need of a place to stay, and gave the victims a home in exchange for sex.[72] Respondent maintains that most of the boys were "prostitutes."[73] On one occasion, he also fondled a twelve-year-old female whom he met at the mall.[74]

On April 6, 1985, Respondent was indicted and arrested on charges that he had sexually abused a thirteen-year-old boy and a twelve-year-old boy.[75] After being released on bail on May 25, 1985, Respondent failed to report to his parole officer and to appear in court.[76] Now a fugitive from the law, Respondent took L.A. and H.D. and absconded to a remote campsite in upstate New York with a generator and an ATV he had stolen.[77] Respondent hid

away at the campsite with the two boys until New York State Police arrested him on August 8, 1985.[78] Police searched the campsite and found numerous photographs of young boys from the area engaging in sexual behavior.[79]

Further investigation led to a sixty-count indictment.[80] On October 15, 1987, Respondent pleaded guilty to eighteen counts, including Kidnapping in the Second Degree, Using a Child in a Sexual Performance, Promoting the Sexual Performance of a Child, Sodomy in the First Degree, and Sodomy in the Second Degree.[81] In November, he pleaded guilty to the initial charges from April 1985.[82] On November 24, 1987, Respondent was sentenced to twelve-and-a-half years to twenty-five years on the Kidnapping charges, seven-and-a-half years for the Use of a Child in a Sexual Performance, and three-and-a-half to seven years for Promoting the Sexual Performance of a Child, to be served concurrently.[83]

## C. Incarceration and Treatment

While serving his state sentence at the Woodbourne Correctional Facility in New York, Respondent had one significant disciplinary incident. On April 7, 1998, Woodbourne correctional officers discover-

---

**66.** Gov't Ex. O at 4; Apr. 27 Tr. 72:10–13.

**67.** Gov't Ex. O at 4; Apr. 27 Tr. 72:13–15.

**68.** Gov't Ex. O at 4; Apr. 27 Tr. 72:16–18.

**69.** Gov't Ex. O at 4.

**70.** Id.

**71.** Joint Ex. 3 at 11.

**72.** Id.

**73.** Id.

**74.** Id.

**75.** Gov't Ex. O at 4; Apr. 27 Tr. 76:3–5.

**76.** Gov't Ex. O at 4; Apr. 27 Tr. 76:12–25.

**77.** Gov't Ex. O at 4; Apr. 27 Tr. 82:6–83:1.

**78.** Gov't Ex. O at 4–5; Apr. 27 Tr. 83:2–84:6.

**79.** Apr. 27 Tr. 84:7–21.

**80.** Gov't Ex. O at 5.

**81.** Id.; Apr. 27 Tr. 85:15–87:12.

**82.** Gov't Ex. O at 5; Apr. 27 Tr. 85:1–14.

**83.** Gov't Ex. O at 5; Apr. 27 Tr. 87:13–23.

ed that Respondent was in possession of several photographs depicting young children.[84] Officer James F. Donaghy testified at trial that he discovered the photographs in a hidden file named "Wayne" on a computer used solely by Respondent.[85] The photos included an image depicting Respondent with his arm around a boy,[86] a picture of another boy in a bathing suit,[87] and a picture of a boy standing in a "Speedo" bathing suit with one leg spread apart from his other leg and elevated on a step.[88] Although the photos were not explicitly pornographic, each of the experts testified that Respondent's unauthorized possession of these materials in prison was more or less troubling and evidenced an ongoing pedophilic interest.[89]

On June 12, 2003, Respondent began attending a sex offender treatment program at Oneida Correctional Facility in New York[90] This intensive six-month treatment, generally known as the Gowanda Program,[91] required Respondent to "answer[ ] questions about why he engaged in the behavior, how distorted his thinking was, how he planned his crimes, his acting out phase, his reward phase, his minimizing, blaming, denial, [and] covering up."[92]

Respondent completed the treatment on December 24, 2003.[93]

At the time of Respondent's release from federal prison in 1981, he remained on federal parole for the 1977 federal kidnapping conviction. While in New York state custody, Respondent's parole officer notified the United States Parole Commission of the charges against Respondent in New York state court, and a parole violation warrant was issued.[94] Respondent completed his New York state sentence on March 11, 2004, whereupon the United States Marshal for the Northern District of New York took him into federal custody.[95] After a final revocation hearing on March 4, 2005, Respondent was ordered to serve the entire balance of his federal sentence for the 1977 kidnapping.[96]

Respondent completed the federal sentence on March 18, 2007.[97] On March 2, 2007, John D. Baxter, a representative of the Director of the Bureau of Prisons, certified that Respondent was a sexually dangerous person as defined by the Act, and the Government filed notice of certification with this court on March 7, 2007. If released, Respondent would be on parole in New York until July 11, 2012.[98]

---

84. Gov't Ex. O at 7; Apr. 27 Tr. 90:10–94:19; Trial Tr. 139:16–143:10, Apr. 28, 2009 ("Apr. 28 Tr.").

85. Apr. 28 Tr. 142:9–143:10.

86. Apr. 27 Tr. 90:14–20.

87. *Id.* 92:1–2.

88. *Id.* 92:2–3; Gov't Ex. E. at 00993.

89. Apr. 28 Tr. 52:15–21, 108:14–109:2; Trial Tr. 69:13–21, Apr. 29, 2009 ("Apr. 29 Tr."); Trial Tr. 76:13–19, Apr. 30, 2009 ("Apr. 30 Tr."); Trial Tr. 86:13–88:2, May 1, 2009 ("May 1 Tr.").

90. Joint Ex. 23 at HU01312; Apr. 30 Tr. 50:17–25.

91. Apr. 30 Tr. 50:17–25.

92. Joint Ex. 3 at 17.

93. Joint Ex. 23 at HU01312.

94. *Hunt v. U.S. Parole Comm'n,* No. 05 Civ. 8996(JCF), 2006 WL 2051069, at *2 (S.D.N.Y. July 21, 2006); Gov't Ex. O at 7.

95. *Hunt,* 2006 WL 2051069, at *2; Gov't Ex. O at 7.

96. *Hunt,* 2006 WL 2051069, at *3; Gov't Ex. O at 7.

97. Gov't Ex. O at 8.

98. *Id.* at 6; Apr. 27 Tr. 89:3.

## D. *Experts' Qualifications*

At trial, the Government sought to prove that Respondent suffers from a serious mental disorder of pedophilia as a result of which he would have serious difficulty refraining from future acts of child molestation if released. Testifying on behalf of the Government were two court-appointed expert examiners, Drs. Bernard Katz and Luis Rosell, both initially selected by Respondent, and retained expert Dr. Amy Phenix. Respondent called retained experts Drs. Joseph Plaud and Howard Barbaree.

Pursuant to 18 U.S.C. § 4247(b), this court designated Dr. Bernard Katz, M.D. as the court-appointed expert in this matter on May 13, 2008.[99] Dr. Katz holds a license in psychiatry in Massachusetts and is board-certified in psychiatry with a subspecialty in forensic psychiatry by the American Board of Psychiatry and Neurology.[100] Dr. Katz has spent most of his career in clinical administration and is currently Senior Psychiatrist at the Worcester County Jail and House of Correction in Massachusetts.[101] He has conducted approximately forty to sixty evaluations in state sexually dangerous persons proceedings.[102] Dr. Katz interviewed Respondent on June 30, 2008.[103] On July 2, 2008, Dr. Katz issued an export report finding that Respondent is a sexually dangerous person within the meaning of the Act.[104]

This court subsequently allowed Respondent's motion to appoint Dr. Luis Rosell as a second expert in this case.[105] Dr. Rosell has been working with sex offenders since 1989[106] and is licensed to practice psychology in Iowa, Missouri, and Washington.[107] Dr. Rosell has testified as an expert in approximately eighty sexually dangerous person cases.[108] He has evaluated more than two hundred sex offenders and has offered an opinion of sexual dangerousness in approximately thirty-five percent of the cases.[109] Dr. Rosell interviewed Respondent on November 20, 2008, and on December 18, 2008, he filed a report concluding that Respondent is a sexually dangerous person under the Act.[110]

Respondent then retained Dr. Joseph Plaud as an expert witness. Dr. Plaud is currently licensed as a psychologist in Massachusetts and has previously been licensed in New York and North Dakota.[111] Dr. Plaud has testified as an expert in sexually dangerous person civil commitment proceedings in New Hampshire, Massachusetts, New York, North Dakota, Washington, Iowa, and Missouri.[112] He interviewed Respondent on March 27, 2009 and filed a report concluding that Respondent is not sexually dangerous on April 7, 2009.[113]

---

99. Parties were asked to confer and submit a joint list of three recommended experts. *See* Order, Apr. 9, 2008. Unable to agree with the Government on a proposed list, Respondent submitted three examiners, including Dr. Katz. *See* Resp't's Resp. to April 9 Order.

100. Apr. 28 Tr. 83:11–84:12.

101. *Id.* 84:1–10.

102. *Id.* 87:8–13.

103. Joint Ex. 1 at 1.

104. *Id.* at 5.

105. *See* Order, Nov. 13, 2008.

106. Apr. 27 Tr. 40:12–13.

107. Joint Ex. 4 at 3.

108. Apr. 27 Tr. 41:22–25.

109. *Id.* 42:10–21.

110. Joint Ex. 3 at 1.

111. Joint Ex. 10 at 1–2; Apr. 30 Tr. 5:12–19.

112. Apr. 30 Tr. 13:5–14.

113. Joint Ex. 9 at 1.

Respondent also retained Dr. Howard Barbaree as an expert. Dr. Barbaree did not conduct an evaluation or risk assessment of Respondent, but testified solely about his research related to the effect of age on sex offender recidivism.[114] Dr. Barbaree has been researching sex offender treatment since 1976 [115] and has published four books, thirty-three book chapters, and sixty-seven articles in the field of sex offender research.[116]

The Government's retained expert, Dr. Amy Phenix, conducted an evaluation from Respondent's psychological records on September 14, 2008, but she was prohibited by court order from examining Respondent in person. Dr. Phenix holds psychology licenses from California, Florida, and Washington.[117] She has been involved in treatment or evaluation of sex offenders since 1989 and has testified in approximately one hundred seventy sex offender cases.[118]

Parties have not challenged the qualifications of these experts. After reviewing their curricula vitae and hearing their testimony, this court finds that Dr. Katz, Dr. Rosell, Dr. Plaud, and Dr. Phenix are qualified to offer expert testimony as to Respondent's dangerousness. Additionally, this court deems Dr. Barbaree qualified to testify as an expert concerning the effects of age on sex offender recidivism rates.

### E. *Diagnosis of Pedophilia*

All four experts who evaluated Respondent agreed that his sexual offense history is consistent with a diagnosis of pedophilia. In reaching a diagnosis, each of the experts relied on the diagnostic criteria in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM–IV–TR"), which is generally relied upon in the fields of psychology and psychiatry.[119] Under the DSM–IV–TR, the diagnostic criteria for pedophilia are:

A. Over a period of at least 6 months, recurrent, intense, sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 or younger);

B. The person has acted on these sexual urges, or the sexual urges or fantasies cause marked distress or interpersonal difficulty;

C. The person is at least age 16 years and at least 5 years older than the child or children in Criterion A.[120]

The DSM–IV–TR also suggests that the diagnosing psychiatrist specify whether the individual is sexually attracted to males, females, or both, and whether the attraction to children is "exclusive" or "nonexclusive." [121] According to the DSM–IV–TR, "the course of pedophilia is usually chronic, especially in those attracted to males." [122]

While disagreeing about whether to characterize the attraction as exclusive,[123] Drs. Katz, Rosell, and Phenix all agreed

---

**114.** May 1 Tr. 85:25–86:2.

**115.** *Id.* 5:20–23.

**116.** Joint Ex. 8 at 7.

**117.** Joint Ex. 6 at 1.

**118.** Apr. 29 Tr. 6:18–24.

**119.** Apr. 27 Tr. 95:16–97:12; Apr. 28 Tr. 96:24–98:14; Apr. 29 Tr. 18:9–12; Apr. 30 Tr. 15:16–19.

**120.** Gov't Ex. I.

**121.** *Id.*

**122.** *Id.*

**123.** Dr. Rosell found Respondent's pedophilic attraction to young boys to be "nonexclusive," Apr. 27 Tr. 98:23–99:1, while Drs. Katz and Phenix found his pedophilic attraction to be exclusive, Joint Ex. 1 at 5; Apr. 29 Tr. 13:6–8.

that Respondent currently suffers from pedophilia. Dr. Rosell testified that Respondent has "one of the more extreme cases of pedophilia" that he had ever seen.[124] Before his incarceration, Respondent's life was "out of control" and "completely dominated" by his pedophilic interests.[125] Respondent has sexually offended against multiple boys over long periods of time, often on a daily basis, demonstrating "essentially no ability to contain himself."[126] Even Respondent's retained expert, Dr. Plaud, agreed that "virtually every aspect of his life" outside of prison was directed to molesting prepubescent boys.[127]

After agreeing that Respondent has met the diagnostic criteria for pedophilia in the past, Dr. Plaud was more equivocal on the question of whether Respondent currently suffers from the disorder.[128] Dr. Plaud's position seems to be that "the diagnosis could be made," but he would be more comfortable making the diagnosis if he had more current data.[129] All three of the other experts, however, testified unequivocally that a diagnosis of pedophilia remains appropriate for Respondent.[130] Dr. Rosell and Dr. Phenix both testified that sexual arousal to children is akin to "sexual orientation" and not subject to change.[131]

## F. *Serious Difficulty Refraining*

In order to commit Respondent, the Government must show that his disorder causes him "serious difficulty in refraining from sexually violent conduct or child molestation."[132] At trial, Drs. Katz, Rosell, and Phenix all concluded that Respondent's pedophilia would cause him serious difficulty refraining from further acts of child molestation.[133] Dr. Plaud, on the other hand, opined that Respondent's advanced age precluded any finding that he would have serious difficulty refraining from child molestation.[134] In assessing Respondent's dangerousness, the experts relied, in varying degrees, upon actuarial tools developed to assess a sex offender's recidivism risk, clinical judgment, and various dynamic or individual factors relevant to risk assessment.

### 1. *Actuarial Instruments*

All the experts except Dr. Katz utilized empirical tools, or actuarial instruments, designed to estimate recidivism rates of sex offenders based on historical risk factors. As Dr. Phenix explained, these "actuarial instruments take those risk factors that research says predict future sexual

124. Apr. 27 Tr. 101:14–22.

125. Apr. 28 Tr. 102:7–16.

126. Apr. 29 Tr. 24:12–16.

127. Apr. 30 Tr. 74:1–6.

128. *Id.* 22:12–20 ("Q. [I]s the diagnosis applicable to Mr. Hunt today? A. Yes. Oh, I would diagnose him with pedophilia. His record certainly supports that. If I was asked more specifically, well, what about today, well, you know, many, if not most, pedophiles would have that label throughout their lives, there's no doubt about that. I can't ultimately answer whether Mr. Hunt would validly have that diagnosis today. I would need to have more information than I have.").

129. *See id.* 16:1–23.

130. Apr. 27 Tr. 99:20–22; Apr. 28 Tr. 100:1–12; Apr. 29 Tr. 15:22–15:14.

131. Apr. 27 Tr. 102:15–24; Apr. 29 Tr. 16:5–11. Dr. Phenix and Dr. Rosell also diagnosed Respondent with antisocial personality disorder. Apr. 27 Tr. 95:23–25; Apr. 29 Tr. 22:5–7. Having found that Respondent currently suffers from pedophilia and that pedophilia is a serious mental disorder within the meaning of the Act, see infra Part III.B, this court need not consider evidence that Respondent suffers from antisocial personality disorder.

132. 18 U.S.C.A. § 4247(a)(6).

133. Apr. 27 Tr. 165:19–166:1; Apr. 28 Tr. 107:21–108:1; Apr. 29 Tr. 85:24–86:2.

134. Apr. 30 Tr. 24:18–25:16.

reoffense, ... weight[ ] each one of them statistically for what they contribute to future sexual reoffense, [and] then ... add those weights up to come up with ... an overall risk level and some general probabilities of sexual reoffense." [135]

The actuarial instruments account for a number of risk factors, the presence or absence of which determines the sex offender's risk of reoffense.[136] The weightiest risk factor, for example, is the number of prior sex offenses.[137] On each of the actuarial instruments, the sex offender receives a weighted score for this item based on the number of prior sex offenses. For each of the remaining items, the offender may receive a score of one or zero based on the presence or absence of that risk factor. The number of points for each item is then added up to produce a score representing the offender's risk of reoffense.

The score provided by the actuarial instruments serves two functions. First, the score represents the offender's level of risk relative to other sex offenders. The higher the score, the greater the risk of reoffense. The different instruments use different scoring systems and take into account slightly different risk factors, but all of them have demonstrated moderate predictive accuracy as to relative risk.[138]

The second function of the actuarial score is to provide an estimate of "absolute risk." The score a sex offender receives on any given actuarial corresponds to a statistical rate of recidivism for offenders receiving the same score. This measure of absolute risk, though valuable, is not a perfect measure of a given sex offender's probability of reoffense. First, the overall rate of sexual offending in the sample population, the "base rate," may not reflect the rate of sexual offending in the population as a whole.[139] Second, the actuarials consider only historical factors and do not account for "dynamic factors," which could change a specific offender's absolute risk over the course of his life.[140] Third, the recidivism estimates provided by the actuarials systematically underestimate the actual rate of reoffense because the numbers are based on rearrests.[141] Most sex offenses are never reported, so the statistical level of rearrest for a given actuarial score is generally lower than the true probability that a sex offender will reoffend.[142] Respondent's own case is illustrative, as he has reported many more offenses than his criminal record alone would indicate.[143]

The four actuarial instruments used in this case are (1) the Rapid Risk Assessment for Sexual Offense Recidivism ("RRASOR"); (2) the Static–99; (3) the Static–2002; and (4) the Minnesota Sex Offender Screening Tool—Revised ("MnSOST–R"). Each of the experts agreed that these actuarial instruments are generally accepted within the community of experts conducting sex offender

135. Apr. 29 Tr. 27:18–25.

136. *See* Joint Ex. 9 at 12.

137. Apr. 29 Tr. 25:24–26:5.

138. *Id.* 33:2–34:22 (explaining that "moderate predictive accuracy" means that an actuarial instrument is able to discriminate accurately between high risk and low risk offenders "about 70 percent of the time"); *see also United States v. Shields*, 597 F.Supp.2d 224, 236 (D.Mass.2009).

139. Apr. 28 Tr. 7:9–8:7.

140. Dr. Plaud referred to this limitation as the "broken-leg problem," stating that "[i]f a person has a seizure or is in a coma, they may score [high on an actuarial instrument], but if they're not able to get out of bed, they're not going to be very risky." Apr. 30 Tr. 40:10–22.

141. *Id.* 60:24–61:4.

142. Apr. 29 Tr. 51:18–52:6.

143. *Id.* 52:7–14.

risk assessments.[144] On each of the four instruments used by these experts, Respondent scored in the "high risk" range.

### a. *RRASOR*

The RRASOR is an actuarial instrument developed in 1997 by Dr. Carl Hanson and is a relatively simple tool consisting of only four risk factors.[145] The score is based on (1) number of prior sex offenses; (2) age at time of release; (3) victims' gender; and (4) relationship to the victims.[146] The RRASOR score ranges from zero to six, with six representing the highest risk level.[147]

Although not accepting the score as an accurate measure of Respondent's individual risk, Dr. Plaud scored Respondent as a five on the RRASOR, which signifies a high risk of reoffense.[148] The estimated recidivism rates for an individual with a score of five on the RRASOR, without adjusting for dynamic factors such as advanced age, are 49.8% over a five-year period and 73.1 % over a ten-year period.[149] Dr. Plaud testified that he only uses the RRASOR as a starting point and that risk assessment must also take into account dynamic risk factors.[150] In his opinion, Respondent's advanced age renders his score "meaningless today." [151] None of the other experts scored Respondent on the RRASOR.

### b. *Static–99*

The Static–99 was developed by Dr. Hanson and Dr. David Thornton in 1999 and is the most widely used actuarial tool in sex offender risk assessment.[152] The Static–99 consists of ten items, which are statistically correlated to a high risk of sexual reoffending.[153] The score is based on the following risk factors: (1) age at time of release; (2) relationship status; (3) index nonsexual violence; (4) prior nonsexual violence; (5) number of prior sex offenses; (6) number of prior sentencing dates; (7) number of convictions for noncontact sex offenses; (8) unrelated victims; (9) related victims; and (10) victims' gender.[154] Scores on the Static–99 range from zero to twelve, with twelve representing the highest risk level.[155]

Dr. Rosell and Dr. Phenix both scored Respondent at eleven,[156] the highest possible score for an individual of Respondent's age.[157] Such a score places Respondent in the high risk category.[158] The average score on the Static–99 is "about a two." [159] Dr. Phenix testified that a score of eleven

**144.** Apr. 27 Tr. 115:19–116:2; Apr. 29 Tr. 32:15–17, 47:19–23, 56:13–15. Dr. Barbaree, though not conducting a risk assessment in this case, testified that the actuarial instruments used by the other experts were developed using well established principles of statistics and are generally accepted in the field. May 1 Tr. 90:21–92:15.

**145.** Apr. 27 Tr. 111:8–17.

**146.** Joint Ex. 9 at 12.

**147.** *Id.*

**148.** *Id.*

**149.** *Id.* at 13.

**150.** Apr. 30 Tr. 40:1–12.

**151.** *Id.* 35:24–36:4.

**152.** Apr. 27 Tr. 111:24–112:2.

**153.** *Id.* 123:11–14.

**154.** Joint Ex. 26.

**155.** Apr. 27 Tr. 127:5–8; Apr. 29 Tr. 35:14–16.

**156.** Apr. 27 Tr. 126:24–25; Apr. 29 Tr. 44:16–17.

**157.** Of the twelve risk factors considered by the Static–99, the only one that Respondent does not exhibit is being under the age of twenty-five. Apr. 27 Tr. 133:24–134:4.

**158.** Joint Ex. 26.

**159.** Apr. 29 Tr. 35:17–19.

is "rare," [160] and Dr. Rosell testified that he had never previously seen a score of eleven. [161] In the sample of 6400 sex offenders assessed in the most recent Static–99 study, no offender scored as high as eleven, and only twenty-two scored a ten. [162] As a result, there is no risk estimate percentage associated with Respondent's score. Dr. Rosell and Dr. Phenix both used the recidivism rate for a score of ten. [163] In the most recent Static–99 study, sex offenders scoring a ten recidivated at a rate of 51.0% over five years and 66.0% over ten years. [164] According to the logistic regression estimates derived from this data, a score of ten indicates reoffense probability rates of 34.9% to 50.0% over a five-year period and 49.7% to 59.9% over a ten-year period. [165]

Dr. Plaud did not score Respondent on the Static–99. Dr. Katz performed an informal scoring of the Static–99 "in [his] own mind," giving Respondent "the benefit of the doubt," and estimated Respondent's score to be eight or nine. [166] Dr. Katz testified that such a score is "still a serious risk of reoffending." [167]

#### c. *Static–2002*

The Static–2002 is a newer version of the Static–99. [168] The instrument is gener-

ally accepted within the psychological community, but it has only recently come into use. [169] The Static–2002 consists of thirteen items, which are divided into categories by risk type to better identify the source of the risk. [170] According to Dr. Rosell, "one of the big changes" from the Static–99 is that the Static–2002 better accounts for the age of the sex offender. [171] Where the Static–99 only considers whether the offender is below the age of twenty-five, [172] the Static–2002 divides offenders into four separate age groups: 18 to 24, 25 to 34, 35 to 49, and 50 or older. [173] The youngest group represents the most likely to reoffend. [174]

Scores on the Static–2002 range from zero to fourteen, with fourteen representing the greatest risk. [175] Dr. Phenix scored Respondent as a ten on the Static 2002, putting him in the "high risk" range. [176] According to the norms associated with the Static–2002, a score of ten reflects a probability of sexual rearrest of 25.4% to 37.8% in the first five years and 30.5% to 45.5% over ten years. [177]

#### d. *MnSOST–R*

The MnSOST–R is another actuarial instrument designed to assess a sex offender's risk of reoffense. The instrument consists of sixteen items. [178] Unlike the

---

160. *Id.* 55:1–3.

161. Apr. 27 Tr. 127:11–15.

162. Gov't Ex. L at 1; Apr. 27 Tr. 127:25–128:7; Apr. 28 Tr. 16:12–23.

163. Apr. 28 Tr. 16:12–17:3.

164. Gov't Ex. L at 1, 2; Apr. 27 Tr. 130:4–7; Apr. 28 Tr. 73:16–19.

165. Apr. 27 Tr. 131:7–14; Apr. 28 Tr. 73:13–15; Apr. 29 Tr. 51:2–14.

166. Apr. 28 Tr. 110:4–111:8.

167. *Id.* 111:9–11.

168. Apr. 27 Tr. 112:22–25.

169. *Id.* 112:21–113:1; Apr. 29 Tr. 56:8–15.

170. Apr. 29 Tr. 55:16–23.

171. Apr. 27 Tr. 113:2–6.

172. Joint Ex. 26.

173. Joint Ex. 27.

174. *Id.*

175. *Id.*; Apr. 29 Tr. 56:16–18.

176. Apr. 29 Tr. 56:19–20.

177. *Id.* 58:9–59:8.

178. Apr. 27 Tr. 112:3–7.

other actuarial instruments, which consist solely of static or historical factors, the MnSOST–R also accounts for so-called dynamic factors, such as sex offender treatment and employment.[179] In addition to including dynamic factors, the MnSOST–R accounts for some static factors that are not present in other instruments, such as whether the offender has committed an offense in a public place.[180] Only Dr. Phenix used the MnSOST–R in evaluating Respondent.

Dr. Phenix gave Respondent a score of fourteen on the MnSOST–R.[181] A score of eight or above is in the high risk range.[182] A score of thirteen or above is in the range known as "refer" because such a score leads to automatic referral for evaluation under the Minnesota sexually violent predator law.[183] An older study of sex offenders who were not subject to intensive community supervision indicated that individuals with a score of fourteen on the MnSOST–R reoffend at a rate of 72% over six years.[184] A more recent sample of sex offenders subjected to intense community supervision revealed a recidivism rate of approximately 40% over six years for sex offenders with a MnSOST–R score of fourteen.[185]

### 2. Dr. Katz's Clinical Evaluation

Dr. Katz did not significantly rely on any actuarial instruments in evaluating Respondent's risk, but followed a clinical judgment approach guided by empirical data. In his opinion, because actuarial instruments only address populations, they are of only limited use as applied to individuals.[186] Furthermore, Dr. Katz viewed the Act's language as requiring an assessment of Respondent's ability to refrain from sexually molesting children and not strictly the probability that he would reoffend.[187] In Dr. Katz's opinion, Respondent would have serious difficulty refraining from such sexual misconduct if released.

Dr. Katz based his conclusion on "the totality of the material in the record" and the severity and persistence of Respondent's pedophilia.[188] Dr. Katz emphasized Respondent's multiple convictions, multiple victims, and multiple violations of probation and parole.[189] Dr. Katz referenced Respondent's possession of images of children while in prison as evidence of Respondent's continuing inability to manage his sexual interest in children.[190] Dr. Katz characterized Respondent's pedophilia as severe, stating that his "life was completely dominated by his pedophilic interests. His life was out of control. He seemed to me . . . to be living for his pedophilic sexual interests." [191]

### 3. Dynamic Risk Factors

The historical or static factors accounted for by the actuarial instruments are facts from an offender's past that cannot change.[192] If an individual has two prior sex offenses, for example, he will always have at least two prior sex offenses.[193]

---

179. *Id.* 112:3–14.

180. Apr. 29 Tr. 60:12–16.

181. Joint Ex. 28; Apr. 29 Tr. 61:1–6.

182. Apr. 29 Tr. 61:7–12.

183. *Id.* 61:13–16.

184. *Id.* 61:24–62:3.

185. *Id.* 62:4–7.

186. Apr. 28 Tr. 109:19–110:3.

187. *Id.* 115:6–10.

188. *Id.* 108:2–6.

189. *Id.* 103:8–104:9.

190. *Id.* 108:7–13.

191. *Id.* 102:9–16.

192. Apr. 27 Tr. 119:20–25; Apr. 29 Tr. 31:3–9.

193. Apr. 29 Tr. 31:5–7.

Historical factors are strong predictors of future sexual reoffense,[194] but the research in the field indicates that other dynamic variables also influence a sex offender's overall risk of reoffense. Accordingly, each of the experts also weighed various aggravating and mitigating dynamic risk factors to adjust Respondent's historical risk to account for Respondent's current circumstances.

### a. The Effect of Age

The most important dynamic factor, according to each of the experts, and the critical issue in this case is the effect of Respondent's age on his risk. Respondent was sixty-three at the time of trial.[195] Each of the experts who evaluated Respondent agreed that recent research has demonstrated a significant decrease in recidivism rates for sexual offenders over age sixty.[196] Where the experts differ is the issue of how significant the effect of aging is.

### i. The Effect of Age on Sexual Offending Generally

A leader in research on the effects of age on sexual recidivism is Dr. Howard Barbaree, who testified as an expert on behalf of Respondent at trial. Dr. Barbaree did not evaluate Respondent individually, so he only testified as to the effect of aging on sex offender recidivism generally.[197] Dr. Barbaree testified that the available data on child molester recidivism rates reveals an increase in recidivism from ages eighteen to twenty-five followed by a linear decline in sexual recidivism over the remainder of the offender's life.[198]

The decline in sex offender recidivism with age is consistent with findings in criminology indicating that criminal behavior generally declines with age.[199] Dr. Barbaree testified that the decline is also explained by findings of biology and behavioral psychology. Research in these fields indicates that a decrease in testosterone levels results in a concomitant reduction in sexual behavior.[200] Studies have revealed that this effect holds true for sex offenders, finding that castration or testosterone reductions of sex offenders yields significant drops in recidivism rates.[201] This correlation between testosterone levels and sexual behavior is significant to age because, beginning in the teenage years and continuing throughout the remainder of a male's life, testosterone levels naturally decline.[202]

Dr. Barbaree testified that actuarial risk assessment instruments should not be directly applied to offenders as old as Respondent because older offenders are dissimilar to the developmental samples in significant ways.[203] Dr. Barbaree explained that the recidivism percentages associated with the actuarial scores are inaccurate when applied to older offenders because the average age in the developmental samples is in the mid thirties.[204] Although suggesting that the actuarial instruments fail to account for age adequately, Dr. Barbaree acknowledges that no generally accepted methodology for doing so exists.[205] Dr. Barbaree recognized

194. *Id.* 31:10–15.

195. Apr. 30 Tr. 26:23.

196. Apr. 27 Tr. 142:18–143:1; Apr. 28 Tr. 27:22–28:2, 73:22–74:2; Apr. 29 Tr. 74:13–23; Apr. 30 Tr. 26:16–27:3.

197. May 1 Tr. 55:8–19.

198. *Id.* 32:16–20.

199. *Id.* 28:21–29:10.

200. *Id.* 16:18–17:11.

201. *Id.* 17:12–19.

202. *Id.* 27:6–16.

203. *Id.* 49:11–50:3.

204. *Id.* 50:7–16.

205. *Id.* 89:15–21.

that appropriate methodologies include (1) offering an expert opinion with no reference to actuarial instruments; (2) offering an opinion using empirically guided judgment; (3) using recidivism base rates for each age group as reflected in published studies; and (4) using mathematical analysis to adjust the risk estimates from the actuarial instruments.[206]

Dr. Barbaree testified that, while actuarial recidivism estimates do not accurately reflect the absolute risk of older offenders, actuarial instruments remain effective at discriminating between low and high risk offenders within a given age group.[207] Dr. Barbaree also acknowledged that, although most offenders experience a decline in absolute risk of reoffense with age, individual offenders have continued to offend into their sixties and seventies.[208]

Although all of the experts at trial agreed that advanced age results in some decrease in risk of reoffense, the precise extent of this effect is not at all settled in the field. At least one group of researches denies that aging has any effect on risk of sexual reoffense, but none of the experts at trial credited the group's findings.[209] Another study found that the base rate of sexual reconviction for a sample of 1300 offenders was 5.6% between the ages of forty and fifty, and then actually increased slightly after age fifty-five to a rate of 6.1 %.[210]

Dr. Phenix cautioned against "lumping" all sex offenders together without taking into account how aging may affect different subgroups of offenders differently.[211] Dr. Rosell, Dr. Phenix, and Dr. Barbaree all cited a study finding no decline in recidivism rates between the ages of forty and sixty for sex offenders with three or more prior convictions for a sex offense.[212] Dr. Phenix referred to this group as "sexual specialists," a class of high risk offenders that does not experience the linear decrease in risk that most offenders undergo, but instead maintains about a fifty percent rate of reoffense through age fifty-nine.[213] Dr. Barbaree stated that the issue regarding whether certain subgroups may not follow the linear decrease in recidivism rates "remains to [be] resolved in the literature."[214]

Another issue related to the effect of age on recidivism rates that remains unresolved in the literature is whether the most dangerous offenders are underrepresented in the recidivism studies. The most dangerous offenders are more likely to serve the longest sentences if convicted and are likely to grow old in prison.[215] These most dangerous offenders may be underrepresented in the available data and could constitute a group of "offenders whose risk remains unacceptably high as long as they are physically capable."[216]

ii. *The Effect of Age on Respondent's Risk Specifically*

Dr. Plaud testified that Respondent's advanced age renders his scores on the actuarial instruments "meaningless."[217] According to Dr. Plaud, the overall recidi-

**206.** *Id.* 50:20–51:1, 52:20–53:2, 102:1–16.

**207.** *Id.* 61:15–24.

**208.** *Id.* 98:2–99:12.

**209.** E.g., Apr. 30 Tr. 76:9–24.

**210.** *Id.* 102:5–103:10.

**211.** Apr. 29 Tr. 78:1–4.

**212.** Apr. 27 Tr. 148:12–20; Apr. 29 Tr. 75:3–76:2; May 1 Tr. 43:7–21.

**213.** Apr. 29 Tr. 75:18–76:5.

**214.** May 1 Tr. 43:16–21.

**215.** Apr. 29 Tr. 177:9–178:11.

**216.** *Id.* 178:6–19.

**217.** Apr. 30 Tr. 35:24–36:9.

vism rate of offenders over sixty is so low that "there is no earthly, scientific way to predict in the affirmative that someone is going to reoffend" at that age.[218] He characterized Respondent's age as "determinative" in his risk assessment.[219] Elsewhere, Dr. Plaud adjusted the actuarial recidivism rate estimates associated with Respondent's score by subjecting the data underlying the RRASOR recidivism estimates to a statistical formula known as Bayes' Theorem.[220] Comparing the base rate of reoffense for the RRASOR samples to the overall base rate of reoffense for sex offenders over age sixty, Dr. Plaud estimated that Respondent's RRASOR recidivism rate adjusted for age is 24.2%.[221] Dr. Plaud did not believe a 24.2% rate of rearrest would reflect a serious difficulty refraining from sexual reoffense within the meaning of the Act.[222] Dr. Plaud stated that it is "possible" that Respondent will reoffend, but explained that he viewed his role as determining not what is possible but what is "probable" or likely beyond a reasonable doubt.[223]

Drs. Katz, Rosell, and Phenix all reduced Respondent's risk to account for his advanced age, but all three determined that he would still have serious difficulty refraining from sexually reoffending if released. Dr. Katz testified that Respondent's advanced age was "prognostically favorable" to Respondent.[224] But, according to Dr. Katz, Respondent's pedophilia is so severe that, even after weighing Respondent's age in his favor, Respondent remains sexually dangerous.[225]

Dr. Rosell also recognized that risk of sexual reoffense generally declines with age, but he testified that there is no consensus method for adjusting risk down to account for age.[226] Dr. Rosell declined to adjust risk according to a mathematical formula as Dr. Plaud attempted.[227] He believes that the vast majority of sex offenders over age sixty are no longer sexually dangerous,[228] but the persistence and severity of Respondent's sex offending history together with his uncommonly high actuarial score make him an outlier.[229]

Dr. Phenix agreed that age is a protective factor.[230] But like Dr. Rosell, Dr. Phenix declined to apply a mathematical formula to adjust for age because such an approach ignores how age affects different types of sex offenders differently.[231] Dr. Phenix noted that Respondent has more than three sex offense convictions and would thus meet the characteristics of the "sexual specialist" subgroup of offenders who do not experience a linear decline in rates of sexual reoffending.[232] Dr. Phenix also pointed out that when Respondent was in his late thirties, before he was incarcerated, he was still sexually offending multiple times daily even though the general sex offender statistics would predict a decline in recidivism rates over this

218. *Id.* 42:8–19.

219. *Id.* 84:15–18.

220. Joint Ex. 9 at 13; Apr. 30 Tr. 45:25–46:23.

221. Joint Ex. 9 at 13–14; Apr. 30 Tr. 45:25–46:13.

222. Apr. 30 Tr. 36:21–37:2.

223. *Id.* 34:18–35:1, 49:6–16.

224. Apr. 28 Tr. 112:5–22.

225. *Id.* 112:12–22.

226. Apr. 27 Tr. 149:19–20.

227. *Id.* 149:16–24.

228. *Id.* 164:11–14.

229. *Id.* 164:15–19.

230. Apr. 29 Tr. 72:6–73:5.

231. *Id.* 85:8–11.

232. *Id.* 75:24–25.

period.[233] According to Dr. Phenix, Respondent's history indicates that "his age does not erase his risk" but requires a "modest reduction" of his overall risk, putting him at the low end of the range of recidivism rates associated with his actuarial scores.[234] Dr. Phenix concluded that Respondent's "risk of future sexual reoffense is so high, that he's such a sexual specialist and that he has suffered from [such] a severe paraphilia of pedophilia throughout his life and has had such poor volitional controls over it" that he meets the criteria for commitment under the Act in spite of his age.

### b. *Other Dynamic Risk Factors*

Sex offender treatment is another dynamic factor that may reduce an offender's risk of sexual reoffense. Respondent underwent six months of sex offender treatment while incarcerated in New York.[235] Because sex offender treatment generally must last between two to four years to be effective, Drs. Katz, Rosell, and Phenix testified that Respondent's treatment was inadequate.[236] Dr. Plaud testified that he rarely considers treatment a significant protective factor and that it was not a protective factor for Respondent.[237]

Another potential protective factor is supervised release.[238] Respondent will be on parole in New York until July 2012.[239] Dr. Katz testified that supervised release and time in a halfway house could help Respondent manage his impulses, but not enough to alter Dr. Katz's opinion that Respondent would have serious difficulty refraining from child molestation.[240] Dr. Phenix agreed that community supervision could reduce Respondent's risk, but noted that it has not prevented Respondent from sexually offending in the past.[241] Dr. Phenix also testified that three years is not lengthy enough to reduce Respondent's risk significantly.[242] Dr. Plaud does not consider conditions of supervised release to be a protective factor.[243]

Dr. Phenix and Dr. Rosell also assessed various dynamic factors contained in the Stable 2000 and Stable 2007 risk assessment instruments.[244] These instruments consider (1) intimacy deficits, such as hostility towards women, capacity for relationships, and lack of concern for others; (2) sexual self-regulation; (3) cooperation with supervision; and (4) general self-regulation.[245] Neither Dr. Phenix nor Dr. Rosell found these dynamic factors to affect Respondent's risk substantially.[246] Dr. Rosell testified that many of the factors were difficult to apply to Respondent because he has been incarcerated for so long.[247]

### III. *Conclusions of Law*

■ The Government has the burden of proving that Respondent is a "sexually

---

233. *Id.* 81:8–82:2.

234. *Id.* 86:3–6.

235. Apr. 27 Tr. 141:8–9.

236. *Id.* 141:12–17; Apr. 28 Tr. 114:12–22; Apr. 29 Tr. 87:7–11.

237. Apr. 30 Tr. 68:9–25.

238. Apr. 28 Tr. 116:7–13; Apr. 29 Tr. 88:8–14.

239. *See* Gov't Ex. O at 6; Apr. 27 Tr. 89:3.

240. Apr. 28 Tr. 116:22–117:17.

241. Apr. 29 Tr. 88:8–89:3.

242. *Id.* 89:4–5.

243. Apr. 30 Tr. 110:7–12.

244. Joint Ex. 3 at 21–23; Joint Ex. 5 at 25–28; Apr. 27 Tr. 135:23–136:2.

245. Joint Ex. 3 at 21–23; Joint Ex. 5 at 25–26.

246. Joint Ex. 3 at 21–23; Joint Ex. 5 at 25–28; Apr. 27 Tr. 136:3–138:9.

247. Apr. 27 Tr. 137:22–138:9.

dangerous person" under the Act. To meet this burden, the Government must make two primary showings: (1) that Respondent has "engaged or attempted to engage in sexually violent conduct or child molestation" in the past; and (2) that Respondent "is sexually dangerous to others." [248] The sexual dangerousness determination in turn requires two findings: (a) that Respondent "suffers from a serious mental illness, abnormality, or disorder"; and (b) that as a result Respondent "would have serious difficulty in refraining from sexually violent conduct or child molestation if released." [249]

▮ The Government has the burden of proving that Respondent is sexually dangerous by clear and convincing evidence.[250] The clear and convincing evidence standard is an "intermediate standard," lying somewhere "between preponderance of the evidence and proof beyond a reasonable doubt." [251] The Government must produce "[e]vidence indicating that the thing to be proved is highly probable or reasonably certain." [252]

### A.  Child Molestation in the Past

The first criterion for commitment under the Act is a finding that Respondent has "engaged or attempted to engage in sexually violent conduct or child molestation" in the past.[253] Respondent concedes that he has engaged in child molestation in the past. His extensive criminal record and lengthy history of sexual offending detailed above prove beyond a reasonable

doubt that Respondent meets the first element of the Act.

### B.  Serious Mental Illness, Abnormality, or Disorder

The second criterion for commitment is a finding that Respondent currently suffers from a serious mental illness, abnormality, or disorder. Based on the severity and persistency of Respondent's sexual fixation on prepubescent adolescents and the testimony of all four experts who examined Respondent, particularly Drs. Rosell, Katz, and Phenix, this court finds that Respondent currently suffers from the mental disorder pedophilia. The Supreme Court has concluded that pedophilia is a serious mental disorder for purposes of civil commitment of sexually dangerous persons.[254] Accordingly, the Government has met its burden with respect to the second criterion for commitment under the Act.

### C.  Serious Difficulty Refraining

The final criterion for commitment is a showing that Respondent would have serious difficulty refraining from future acts of child molestation if released.

#### 1.  Definition of "Serious Difficulty Refraining"

The Act does not define "serious difficulty refraining." Dr. Rosell testified that he did not understand the standard to require a specific probability of reoffense, as is required in various states.[255] In Dr. Katz's opinion, the serious difficulty requirement "doesn't even have anything to do with reoffense." [256] Dr. Phenix equated serious

---

**248.**  18 U.S.C.A. § 4247(a)(5).

**249.**  *Id.* § 4247(a)(6).

**250.**  *Id.* § 4248(d).

**251.**  *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979).

**252.**  Black's Law Dictionary 596 (8th ed. 2004).

**253.**  18 U.S.C.A. § 4247(a)(5).

**254.**  *See Kansas v. Hendricks*, 521 U.S. 346, 360, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997).

**255.**  Apr. 27 Tr. 166:8–167:5.

**256.**  Apr. 28 Tr. 115:6–10.

difficulty refraining with inability to control one's sexual urges.[257]

The approach of these experts to the serious difficulty criterion for commitment is consistent with the guidance provided by the Supreme Court in *Kansas v. Crane*. Reviewing a Kansas state civil commitment statute before passage of the Adam Walsh Act, the Court held a showing of "serious difficulty in controlling behavior" was a prerequisite to civil commitment of a sexually dangerous person.[258] The Court added that lack of control need not be "demonstrable with mathematical precision," but "when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself," the offender's lack of control "must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case."[259]

■ Accordingly, this court does not construe the "serious difficulty" criterion for commitment to require proof of any statistical probability of reoffense. The Act does not ask the finder of fact to determine exactly how likely Respondent is to reoffend, but whether he will have "serious difficulty refraining" from doing so. Recidivism rates are circumstantially relevant to the serious difficulty inquiry because offenders who continually expose themselves to punishment may be presumed to have the most difficulty refraining from sexual reoffending. But the ultimate question called for by the Act concerns the self-control of an individual, not the statistical rearrest patterns of a given population. This court thus considers the recidivism rates associated with Respondent's actuarial scores, but affords them less weight than Respondent's past conduct, the severity of his pedophilia, and the testimony of the experts.[260]

### 2. Respondent Would Have Serious Difficulty Refraining

Viewed as a whole, the record demonstrates that Respondent would have serious difficulty refraining from future acts of child molestation if released. Although his advanced age in all probability decreases Respondent's risk of reoffense somewhat, it does not diminish the risk such that Respondent can not be expected to have serious difficulty refraining within the meaning of the Act. Drs. Katz, Rosell, and Phenix all agreed that Respondent's age reduces his risk, but that Respondent is still sexually dangerous. The opinion of court-appointed experts Dr. Katz and Dr. Rosell are particularly weighty given that they were appointed as independent examiners at the request of Respondent.

Dr. Plaud took the position that no sex offender can be said to remain sexually dangerous after age sixty, but Dr. Plaud based this position on the assumption that commitment requires proof beyond a reasonable doubt that Respondent will reoffend, rather than the serious difficulty finding called for by the Act. Moreover, Dr. Plaud's estimate that Respondent is

257. Apr. 29 Tr. 24:2–16.

258. *Kansas v. Crane*, 534 U.S. 407, 413, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002).

259. *Id.*

260. *Cf. Shields*, 597 F.Supp.2d at 236 n. 16 ("While I have considered Mr. Shields' scores on the actuarial instruments, these scores are not the primary basis upon which I rest my conclusion of sexual dangerousness.... Rather, as detailed above, I focused on Mr. Shields' past conduct, lack of successful sex offender treatment to date, and the testimony of the experts as a whole....").

24.2% likely to reoffend may account for the average decline in recidivism rates of high risk offenders generally, but it does not account for data indicating that sexual specialists—offenders with three or more prior convictions for sex offenses—maintain a 50% recidivism rate up to age sixty. Nor does Dr. Plaud's adjusted recidivism rate account for the systematic underestimate of actual risk due to underreporting of sex offenses. Accordingly, this court declines to find that no sex offender over age sixty meets the criteria for commitment under the Act.

Viewing the statistical evidence in conjunction with Respondent's own history rather than in isolation, it becomes evident that Respondent will continue to have serious difficulty refraining from child molestation if released, even at his advanced age. Respondent's possession, while incarcerated, of photographs of young children reflects a continuing interest in prepubescent children. Respondent's criminal history comports with that subset of "sexual specialists" that continues to reoffend at an advanced age. His long and serious history of sexual offending against minor children continued unabated up to the day of his incarceration. Respondent was offending daily well into the years in which sexual behavior typically declines. As Dr. Barbaree acknowledged, some sex offenders continue to reoffend into their sixties and seventies.[261] While actuarial instruments do not provide accurate absolute risk estimates in older offenders, Dr. Barbaree testified that the instruments remain effective at discriminating between high and low risk offenders within a given age group.[262] Respondent's risk relative to other sex of-fenders his age is as high as possible according to the Static–99.

The record as a whole indicates that Respondent is sexually dangerous within the meaning of the Act. Three experts, including two court-appointed examiners recommended by Respondent, concluded that Respondent would have serious difficulty refraining from child molestation if released. Dr. Rosell has treated hundreds of individuals suffering from pedophilia, and he testified that Respondent is "one of the more extreme cases of pedohilia" that he had seen.[263] Respondent's high scores on the available actuarial instruments, while not determinative of dangerousness, indicate that Respondent's risk is on the extreme end relative to other sex offenders. Respondent's score of eleven on the Static–99, the most widely used actuarial risk assessment instrument, is so high that few sex offenders ever reach that score. Respondent was "not just offending on a few children here and there," but directed his "whole life" to seeking out children for sex.[264] Even when subjected to the supervision of the state, which generally lowers recidivism rates, Respondent continued to offend on a daily basis, even escalating his offending conduct and fleeing from authorities when on parole. When not incarcerated and forcibly prevented from reoffending, Respondent has shown "essentially no ability to contain himself,"[265] even when various mitigating factors in his life, such as advancing age and state supervision, would have predicted a decline in risk.

In view of the evidence as a whole, and affording significant weight to the opinion of the two court-appointed experts, this court finds Respondent would have serious

261. *Id.* 98:2–99:12.

262. May 1 Tr. 61:15–24.

263. Apr. 27 Tr. 101:14–18.

264. *Id.* 100:6–11.

265. Apr. 29 Tr. 24:12–16.

difficulty refraining from future acts of child molestation if released.

## IV. *Conclusion*

For the foregoing reasons, this court concludes that Respondent is a sexually dangerous person and orders his COMMITMENT pursuant to the Adam Walsh Act.

AN ORDER HAS ISSUED.