# United States Court of Appeals

## For the First Circuit

No. 05-2270

UNITED STATES OF AMERICA,

Appellee,

v.

DEEPAK JAHAGIRDAR,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before
Boudin, Chief Judge,
Lynch, Circuit Judge,
and Schwarzer,<sup>*</sup> Senior District Judge.

Kimberly Homan for appellant.
John T. McNeil, Assistant United States Attorney, with whom
Michael J. Sullivan, United States Attorney, was on brief for
appellee.

October 20, 2006

---

<sup>*</sup>Of the Northern District of California, sitting by
designation.

**BOUDIN, <u>Chief Judge</u>**.  On March 31, 2002, Deepak Jahagirdar was seated next to D.S., a 22-year-old woman, on a commercial airline flight from Dallas to Boston.  D.S. later testified that she awoke from a nap to find Jahagirdar's hand inside her underpants.  D.S. cursed at Jahagirdar, pushed her way to the aisle, and immediately told a flight attendant that "[t]he guy next to me had his hand down my pants."

Upon landing, Jahagirdar was arrested.  D.S. was asked to remain onboard the airplane after the other passengers had exited, and was interviewed by Massachusetts State Trooper Kevin Hogaboom.  After disembarking, D.S. was interviewed again and made a written statement.  D.S. was then taken to the hospital for a rape examination.

A grand jury indicted Jahagirdar on February 11, 2004, charging him (so far as is relevant to this case) with sexual abuse and attempted sexual abuse, 18 U.S.C. § 2242(2) (2000), within the special aircraft jurisdiction of the United States, 49 U.S.C. § 46506 (2000).  Sexual abuse includes, subject to other conditions,[1] "the penetration, however slight, of the . . . genital opening of another by a hand or finger or by any object."  18 U.S.C. § 2246(2)(C).

---

[1]The statute requires, in pertinent part, that the penetration be done with requisite intent and to someone incapable of consent. § 2242(2).  That these conditions were satisfied in this case is not contested.

At trial, D.S. testified that Jahagirdar's fingers were "underneath the lip area of the vagina" and that his fingers were "[u]nderneath the outer lips [labia majora] and the inner lips [labia minora]" of her genitals; and she made corresponding marks on an anatomical diagram to illustrate her testimony.

On cross-examination of D.S., Jahagirdar sought to impeach her by suggesting that she had not told the doctor or nurse at the hospital that she had been penetrated, and that she had in fact denied having been penetrated when asked by the doctor. Jahagirdar also implied that she had settled on her description of the alleged assault after consulting a lawyer and after concluding that Jahagirdar was an attractive target for a civil suit.

The government was then allowed to offer evidence from the trooper who had interviewed D.S. at the scene. He testified that, when he asked D.S. whether she had been penetrated, she stated that she had been, and that, on the basis of her response, he recommended that Jahagirdar be charged with rape.

There was also testimony from flight attendants and secret service agents who were on board the plane as to D.S.'s visible emotional distress, and expert testimony that a large quantity of D.S.'s DNA was found on Jahagirdar's hands, consistent with his fingers having come into contact with her vaginal secretions. However, the expert agreed that it was also possible that Jahagirdar could have picked up skin cells from the waistband

of D.S.'s pants, so this forensic evidence did not incontrovertibly establish just where Jahagirdar had placed his hand.

Jahagirdar testified in his own defense. He admitted that he had placed his hand in D.S.'s pants, but claimed that D.S. had begun and encouraged a sexual encounter, that his hand touched only her "pubic hair area," and that he withdrew his hand when he began to feel guilty about betraying his wife's trust.

The jury convicted Jahagirdar of sexual abuse. The district judge sentenced Jahagirdar to 87 months' imprisonment, a term of supervised release, and a $25,000 fine. Jahagirdar now appeals, challenging the critical jury instruction as to the scope of the statute, the admission of D.S.'s statements to the trooper, and certain of the district court's sentencing determinations.

Jahagirdar's first argument on appeal is that the district court erroneously instructed the jury as to an element of the offense. Section 2242(2) criminalizes "knowingly . . . engag[ing] in a sexual act with another person if that other person is . . . physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act." Section 2246(2) in turn defines "sexual act" (we underscore the most pertinent language) as

> (A) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight;

-4-

(B) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus;

(C) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or

(D) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person (emphasis added).

Jahagirdar requested that the court instruct the jury that "penetration of the . . . genital opening" in section 2246(2)(C) refers to the penetration of the "vaginal orifice." The government requested an instruction stating that "genital opening . . . includes not only the vagina itself, but also the anterior parts known as the vulva and labia," so that "penetration of the labia majora, or outer lips, of the vulva is sufficient" to find Jahagirdar guilty of violating section 2242.

The district court chose a middle ground, instructing the jury that the government had to prove beyond a reasonable doubt that Jahagirdar "placed his finger or hand beyond Ms. DS's labia majora to at least the labia minora or inner lips . . . . The government is not required to prove that he penetrated her vaginal or[i]fice." Jahagirdar objected. On appeal, Jahagirdar continues to press his argument that "genital opening" means "vaginal orifice."

The term "genital opening" is not itself a medical term of art. The term "genitalia" refers to the "external and internal" organs of reproduction, Stedman's Medical Dictionary 738 (27th ed. 2000), but "esp[ecially] the external organs," Random House Dictionary 797 (2d ed. unabridged). For women, the "external genitalia" include the mons pubis, the labia majora, the labia minora, the clitoris, and the vaginal orifice. Gray's Anatomy 1876 (38th ed. 1995). "The term . . . vulva includes all these parts." Id.

Taken by itself, the term "genital opening" could conceivable refer to any of at least three successive openings in the female genitalia: (1) the exterior opening bounded by the outer lips or labia majora, (2) the interior opening bounded by the contained inner lips or labia minora, and (3) the opening, yet further along the same channel, called the vaginal orifice.

The most straightforward reading of "genital opening" is that the term encompasses all three orifices including the outermost--a reading given support by the statutory phrase "penetration, however slight." Nor is it clear why Congress would have sought to distinguish among them, treating more leniently the deliberate insertion of a finger into the outermost orifice--given that the perpetrator must be acting without consent and for the mostly malign purposes described in the statute.

The literal reading becomes almost conclusive when one comes to understand that, under state law, the definition of "rape"--whether penile rape or the variant digital rape with which Jahagirdar was charged--is almost always satisfied under state law by penetration of the labia majora, regardless of whether the statute refers to the "genital opening" (as some do), the "female sex organ" (as others do), or even (in a few cases) the "vagina."[2]

---

[2]Several state courts have specifically held, in the context of digital or object rape, that penetration of the "genital opening" is satisfied by penetration of the vulva or labia. See People v. Quintana, 89 Cal. App. 4th 1362, 1366-71 (2001); State v. Albert, 750 A.2d 1037, 1044-46 (Conn. 2000); People v. Bristol, 320 N.W.2d 229, 230 (Mich. Ct. App. 1982) (per curiam); State v. Bellamy, 617 S.E.2d 81, 88 (N.C. Ct. App. 2005). The general pattern of requiring only penetration of the labia majora existed well before Congress adopted the present statutory scheme in 1986. See, e.g., Thomas v. State, 298 So. 2d 652, 656 (Ala. Crim. App. 1974); State v. Pollock, 114 P.2d 249, 250 (Ariz. 1941); Hice v. State, 593 S.W.2d 169, 170-71 (Ark. 1980); People v. Karsai, 131 Cal. App. 3d 224, 232-33 (Cal. Ct. App. 1982); State v. Shields, 45 Conn. 256, 256 (1877); State v. Dill, 40 A.2d 443, 444 (Del. 1945); Lee v. State, 28 S.E.2d 465, 465 (Ga. 1943); People v. Hebel, 527 N.E.2d 1367, 1386-87 (Ill. App. 1988); Short v. State, 564 N.E.2d 553, 559 (Ind. App. 1991); State v. Ragland, 246 P.2d 276, 279 (Kan. 1952); White v. Commonwealth, 28 S.W. 340, 342 (Ky. 1894); State v. Bertrand, 461 So.2d 1159, 1161 (La. Ct. App. 1984); Craig v. State, 136 A.2d 243, 244 (Md. 1957); Commonwealth v. Baldwin, 509 N.E.2d 4, 7 (Mass. App. Ct. 1987); Bristol, 320 N.W.2d at 230; Rhoades v. State, 504 S.W.2d 291, 294 (Mo. Ct. App. 1973); State v. Atkinson, 209 N.W.2d 154, 157 (Neb. 1973); Hutchins v. State, 867 P.2d 1136, 1140-41 (Nev. 1994); State v. J.A., 766 A.2d 782, 785 (N.J. Super. Ct. App. Div. 2001); People v. Crowley, 6 N.E. 384, 384-85 (N.Y. 1886); State v. Johnson, 347 S.E.2d 7, 17-18 (N.C. 1986); Swearingen v. State, 237 P. 135, 137 (Okla. Crim. App. 1925); State v. Wisdom, 257 P. 826, 830 (Or. 1927); Commonwealth v. Ortiz, 457 A.2d 559, 560-61 (Pa. Super. Ct. 1983); State v. Bowles, 52 S.W.3d 69, 74 (Tenn. 2001); State v. Montgomery, 974 P.2d 904, 908 (Wash. Ct. App. 1999); State v. Brady, 140 S.E. 546, 550-51 (W. Va. 1927); Rhodes v. State, 462 P.2d 722, 726 (Wyo. 1969).

Under this rule, known as the "least penetration doctrine," rape laws are "designed to punish the fact, not the degree, of penetration," State v. Albert, 750 A.2d 1037, 1047 (Conn. 2000).

"[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word . . . ." Morissette v. United States, 342 U.S. 246, 263 (1952). Here, no single term is used in all of the state statutes, but the cluster of terms has been given the same meaning by construction and the rationale of Morissette strongly supports the straightforward reading of the statute that we adopt.

Jahagirdar's textual response is to point to use of the term "vulva" in subsections (A) and (B) of the definitional statute, section 2246(2), and argue that Congress must have meant to distinguish between "vulva" and "genital opening" or else it would simply have repeated the prior, more specific term in subsection (C). But if Congress had deliberately intended to depart from the common-law approach, the obvious way would been to say "vaginal orifice" instead of "genital opening."

Although Congress' purpose in using "genital opening" rather than repeating "vulva" cannot be known for sure, one plausible explanation exists and gives Jahagirdar no help. In subsection (A), Congress' concern was with penetration by the

penis, and in subsection (B), with "contact" between the mouth and either "penis," "vulva," or "anus"; in both cases, the use of the female-specific term "vulva" makes sense. By contrast, in subsection (C), use of the gender neutral term "genital opening" may well have been intended to encompass the insertion of "any object" into the penis as well as the vulva.[3]

Jahagirdar also relies upon the rule of lenity, namely, that ambiguities in criminal statutes are to be resolved in favor of the defendant; but that rule requires real uncertainty and applies only when "after seizing everything from which aid can be derived, [a court] can make no more than a guess as to what Congress intended." United States v. Councilman, 418 F.3d 67, 83 (1st Cir. 2005) (quoting Reno v. Koray, 515 U.S. 50, 65 (1995)). In this case, language, policy, and tradition make this a case in which there is no real uncertainty.

There is nothing whatever to Jahagirdar's suggestion that the statute fails to give constitutionally adequate notice that such digital penetration of the labia majora constitutes sexual

---

[3]One of Congress' purposes, avowed in the legislative history, was to modernize rape-statute jargon to use gender neutral language and provide comparable protection where possible. See H.R. Rep. No. 99-594, 99th Cong., 2d Sess. (1986), at 10 (sexual abuse statute "modernizes and reforms Federal rape provisions by . . . defining the offenses in gender neutral terms"); id. at 11 ("The offenses set forth in [the statute] are drafted in gender-neutral terms."); id. at 12 (statutory language was "drafted broadly to cover the widest possible variety of sexual abuse, and to protect both males and females from that abuse.").

abuse.  A criminal statute fails to give adequate notice "if a person of ordinary intelligence examining [only] the language of the statute would be in some way surprised that it prohibited the conduct in question."  Sabetti v. DiPaolo, 16 F.3d 16, 17 (1st Cir.) (alteration in original) (citations omitted) (quoting United States v. Harriss, 347 U.S. 612, 617 (1954); United States v. Colon-Ortiz, 866 F.2d 6, 9 (1st Cir. 1989)) (internal quotation marks omitted), cert. denied, 513 U.S. 916 (1994).

Here, on a common sense reading, the labia majora frame a genital opening, even if there were other openings that might also qualify.  Indulging the acceptable fiction that perpetrators closely read statutes before acting, this statute gave Jahagirdar ample warning that he was courting violation.  Moreover, this is far from the more troubling case of an ill-defined malum prohibitum violation; given the lack of consent, Jahagirdar had to know that his conduct was criminal.  Sabetti, 16 F.3d at 18.

The only close circuit precedent called to our attention expressly rejects Jahagirdar's contention that "genital opening" refers only to the "vaginal orifice."  United States v. Norman T., 129 F.3d 1099, 1104 (10th Cir. 1997), cert. denied 523 U.S. 1031 (1998) ("[The defendant] reads ['genital opening'] to require vaginal penetration, but that is simply not the requirement found in the statute.").  Instead, Norman T. holds that "penetration deep

-10-

enough to cause injury to the labia minora is sufficient to violate" the statute.  Id.[4]

In our case, the district court's instruction seemingly required that penetration be at least within the labia minora. This was an understandably conservative approach not objected to by the government, which had the necessary evidence.  But Norman T. did not require this limitation--it held only that penetration of the labia minora was sufficient to violate the statute.  For the sake of future litigation, we hold explicitly that penetration of the labia majora is sufficient for conviction.

Turning to a different subject, Jahagirdar argues that the trial court erred in admitting testimony concerning statements made by D.S. during her interview with Trooper Hogaboom.  At trial, D.S. was permitted to testify--over defense counsel's hearsay objection--that she had told Hogaboom that Jahagirdar's "hand was inside the vagina."  Hogaboom was permitted to testify--again, over defense counsel's objection--that he had asked D.S. "if there was penetration, and she stated yes," that she told him that

---

[4]Injury is not required by the statute, but Norman T. phrased its holding in those terms because of direct testimony from a doctor that such injury had been caused.  129 F.3d at 1104. Jahagirdar seeks to distinguish Norman T. on grounds that it involved a child and that trial testimony indicated that actual vaginal penetration had occurred, but the court clearly stated that "vaginal penetration . . . is simply not [required]."  Id.

-11-

Jahagirdar's "hand penetrated her vagina," and that, on this basis, he had recommended a charge of rape in his report.[5]

The court admitted D.S.'s out-of-court statements under two theories--as prior consistent statements to rebut a charge of recent fabrication, Fed. R. Evid. 801(d)(1)(B), and as excited utterances, Fed. R. Evid. 803(2). Both are arguably close calls; we think the former a stronger ground than the latter and sufficient to support admission of the evidence.

The excited utterance ruling is not without some foundation. D.S. and others offered detailed testimony that D.S. remained upset for the duration of the flight and through her interview with the trooper, which occurred 90 to 120 minutes after the incident. Although "[t]he time lapse in most excited utterance cases is usually a few seconds, or a few minutes," United States v. Taveras, 380 F.3d 532, 537 (1st Cir. 2004) (citations omitted), there are exceptions stretching into hours.

But these cases involve facts arguably more extreme than those in the present case--including continuing physical pain after beatings or shootings, Webb v. Lane, 922 F.2d 390, 393 (7th Cir. 1991); United States v. Scarpa, 913 F.2d 993, 1017 (2d Cir. 1990), involve continued or renewed insecurity, United States v. Cruz, 156

_____

[5] Although D.S. in talking with the trooper perhaps used the term "vagina" as if it included the labia--colloquially common but medically incorrect--the use of a chart during her trial testimony made clear that Jahagirdar had penetrated only the labia.

-12-

F.3d 22, 30 (1st Cir. 1998), cert. denied, 526 U.S. 1124 (1999); Scarpa, 913 F.2d at 1017, or involve young children who were sexually abused, Morgan v. Foretich, 846 F.2d 941 (4th Cir. 1988); Gross v. Greer, 773 F.2d 116 (7th Cir. 1985). Having noted our doubts, we need not resolve them, given Rule 801(d)(1)(B).

Rule 801(d)(1)(B) permits the admission of a prior statement by a witness when (1) the declarant testifies at trial and is subject to cross-examination; (2) the prior statement is consistent with the declarant's trial testimony; and (3) the prior statement is offered "to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Fed. R. Evid. 801(d)(1)(B) (emphasis added). The "prior statement" must be made "before the charged recent fabrication or improper influence or motive." Tome v. United States, 513 U.S. 150, 167 (1995) (emphasis added).

Jahagirdar says that the prior statements to the trooper were not consistent with D.S.'s in-court testimony. In court, D.S. testified that Jahagirdar touched her labia minora; but Hogaboom was permitted to testify that D.S. told him that Jahagirdar's hand "penetrated her vagina." The inconsistency is probably superficial (see note 5, above), and anyhow both statements are consistent in including penetration of the labia minora--which was the central point of D.S.'s testimony.

Jahagirdar also says that he never charged fabrication, but the cross examination of D.S. plainly implies fabrication. One example will do:

> Q: You did in fact consult with a man named Jeffrey Newman, is that correct?
>
> A: Yes.
>
> Q: And Mr. Newman contacted lawyers on your behalf who represented Mr. Jahagirdar, saying that he had been retained by you, is that correct?
>
> A: Yes.
>
> Q: And he also contacted lawyers who represented Mr. Jahagirdar, asking them if they would settle a claim against him?
>
> A: Yes.

Jahagirdar's best objection is that D.S.'s statements to the trooper did not predate her motive to fabricate, as Tome (and the "recent" fabrication language of the rule) require. Such a motive could have existed from the time of the assault; and the exception would not apply if D.S. was equally conscious, or perhaps just significantly conscious, of the possibility of profit both before and after her statements to the trooper.

In admitting the testimony, the judge implicitly ruled that the alleged motive to fabricate arose or became substantial after D.S.'s statements to the trooper rather than before. To the extent that this ruling involved finding of facts, we review for clear error; to the extent that it reflects a judgment call about

-14-

the application of the rule to the facts, we review for abuse of discretion. United States v. Young, 105 F.3d 1, 8 (1st Cir. 1997). In either case, we affirm. There is no indication that D.S. had a civil suit in mind when interviewed by the trooper not long after the incident itself. Nor, if she had such a suit in mind, would she likely have failed--as Jahagirdar brought out for his own purposes--to mention penetration to the nurse and doctor who examined her.

Even if the trial judge had erred in admitting D.S.'s out-of-court statements, any error would likely have been harmless. United States v. Piper, 298 F.3d 47, 56 (1st Cir. 2002). This is so partly, but not exclusively, because the direct evidence against Jahagirdar was quite strong, comprising D.S.'s unqualified court testimony bolstered by forensic DNA evidence and the independent testimony of the flight attendants and secret service agents that she was visibly upset at the time.

What is equally important is the improbability of Jahagirdar's own testimony. See United States v. Jimenez-Perez, 869 F.2d 9, 11 (1st Cir. 1989). Believing Jahagirdar depended upon believing that D.S., a relatively young woman who said she was thoroughly scared of flying and had taken a sedative prior to boarding (thus her nap), had invited a sexual encounter in the open cabin of the aircraft. It is not surprising that the jury deemed

Jahagirdar's story not to be credible--as did the judge in imposing his own perjury enhancement at sentencing.

Finally, Jahagirdar makes two objections to his sentence of 87 months.  This is the bottom end of the applicable guideline range, given the base offense level of 27 plus a two-level perjury enhancement.  U.S.S.G. §§ 2A3.1, 3C1.1 (2001).  The first objection is that the district court used the term "presumptive" ("presumptively reasonable" and "presumptively appropriate") in referring to the guideline range; the second is that, in Jahagirdar's view, the sentence was unreasonable under the post-Booker advisory guideline scheme.

Unlike many other circuits, we have avoided the term "presumptive" in describing the guideline range.  United States v. Jiménez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006) (en banc), petition for cert. filed, No. 06-5727 (U.S. Aug. 7, 2006).  Instead, we specified in functional terms that the guidelines are a starting point, that they deserve substantial weight, and that the party seeking a variance--upward or downward--needs to specify and establish the supporting circumstances.  Id.  The gap is perhaps not large but we thought our formulation more helpful to judges.

Even where the defendant has preserved an objection to "presumption" references--not the case here[6]--we have generally upheld the resulting sentence where it seemed fairly clear--from the trial judge's explanation and surrounding circumstances--that rephrasing the matter would not alter the result.  E.g., United States v. Sagendorf, 445 F.3d 515, 517 (1st Cir. 2006).  That is plainly so in this instance even if the more demanding requirements of the plain error test are ignored.  United States v. Olano, 507 U.S. 725, 732-37 (1993).

The district court began by determining the applicable guidelines range, and then decided whether to exercise its discretion to impose a non-guidelines sentence, whether by variance or by a formal departure.  The judge noted Jahagirdar's substantial community service, and the judge expressly stated that--prior to Jahagirdar's allocution--he had been inclined to give a "somewhat lower sentence" than the guidelines minimum.

But when Jahagirdar failed to express any "remorse or concern for the victim," or for "traumatiz[ing] her again by lying about who initiated that sexual contact," the judge concluded that the section 3553(a) factors did not permit a lower sentence.  The

---

[6]Jahagirdar claims he preserved his objection.  Although he agrees he did not object in court when the judge used the term "presumptive," he points out that his sentencing memorandum argued that the post-Booker guidelines were only one factor among the several mentioned in section 3553(a).  But there is no indication that the judge failed to consider the other section 3553(a) factors.

judge explained that Jahagirdar's allocution "persuaded me, somewhat to my surprise, that . . . 87 months was necessary and no more than sufficient to serve the goal of deterrence, of sending you a message that this was a serious offense and you can't do this again."

The judge also explained that Jahagirdar's perjury weighed heavily in his decision:

> If the defendant had not committed perjury . . . there probably would have been a compelling case for a downward departure based on a single act of aberrant conduct. But the defendant . . . did not after committing that crime do anything to mitigate or reduce the harm. He acted to aggravate the harm by lying about it and placing into question the victim's character and candor.

Striking the word "presumption" would not alter a sentence justified in this systematic fashion.

The court's thoughtful comments also answer Jahagirdar's last argument that the 87-month sentence was unreasonable, given the aberrant nature of his conduct, his significant charitable activities, and other characteristics. In Jiménez-Beltre, we stated that a sentence is reasonable if the court provides a "plausible explanation" and the overall result is "defensible." 440 F.3d at 519. The district court's thoughtful commentary meets both tests.

Affirmed.