# United States Court of Appeals
## For the First Circuit

No. 12-1394

UNITED STATES OF AMERICA,

Petitioner, Appellee,

v.

JOHN CHARLES VOLUNGUS,

Respondent, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Stahl, Circuit Judges.

Ian Gold, Assistant Federal Public Defender, and Tamara
Fisher, Federal Defender Office, on brief for appellant.
Jennifer A. Serafyn, Assistant United States Attorney, and
Carmen M. Ortiz, United States Attorney, on brief for appellee.

September 17, 2013

**TORRUELLA, Circuit Judge.** Appellant John Charles Volungus challenges an order from the District of Massachusetts directing his civil confinement as a "sexually dangerous person" under the Adam Walsh Child Protection and Safety Act, 18 U.S.C. § 4248 ("the Adam Walsh Act" or "the Act"). Volungus maintains that the government failed to prove by clear and convincing evidence that he was in fact a "sexually dangerous person." Finding no error, we affirm.

## I. Facts and Procedural Background

In detailing the factual background of this case, we look to the district court's findings of fact in addition to the testimony presented at trial.

Volungus was born into a stable, two-parent home in 1967. Although he had two younger brothers, Volungus struggled to maintain friendships with his peers at school. After he graduated from college, Volungus joined the United States Army and was stationed across the United States, Europe, and the Middle East. It was during Volungus's time abroad that he began viewing what he called "teen sex magazines."

In 1998, while stationed at Fort Campbell, Kentucky, Volungus began to download child pornography. He reported collecting pornographic images of children ranging from eighteen months to eighteen years in age, viewing child pornography for seven hours per night on weekdays and for thirteen hours per night,

until 6:00 a.m., on weekends. Volungus also programmed his computer to download and save child pornography when he was not actively using it. Ultimately, he amassed thousands of images of child pornography. That same year, Volungus began visiting internet chat rooms where people discussed sex with children. In these chat rooms, Volungus started having sexualized conversations with people he believed to be minors. He would masturbate as they "talked dirty" to each other. Volungus also took out advertisements on chat room bulletins, seeking to physically meet and have sex with young females.

These behaviors led Volungus to a person with the screen name "IndyGirl." IndyGirl claimed to be a nineteen-year-old female named "Deanna," but was actually an undercover law enforcement officer. Volungus began his communication with her by stating that he wished to meet her for some "real life fun." When IndyGirl later told him that she had a fourteen-year-old sister named "Sarah," Volungus stated that he would like to meet her too, and he discussed where they could all meet to have sex.

In these chats with "Deanna" and "Sarah," Volungus described himself as a "real-life pedophile." He boasted that he had "enjoyed many young girls . . . as young as ten," had filmed a sex tape with a fourteen-year-old, had anal sex with girls fourteen years old and younger, and first had sex with an underage female when he was seventeen and slept with the twelve-year-old girl he

-3-

was babysitting. Eventually, after weeks of chatting, the law enforcement agents arranged a telephone call between Volungus and officers pretending to be Sarah and Deanna. During this call, Volungus specifically talked to "Sarah" about engaging in sexual acts with her. Volungus, "Deanna," and "Sarah" then agreed to meet in person on August 22, 1998. When Volungus arrived at the meeting place with sex toys and lingerie, he approached "Deanna" and "Sarah" only to be surprised and subsequently arrested by military police.

After his arrest, Volungus told law enforcement officials that he had discussed meeting another fourteen-year-old female with the screen name "facialgirl," and that he had spoken with a man in Canada about having sex with his eight- or nine-year-old daughter. However, Volungus claimed that he had never actually had sex with a minor. He pled guilty to an eight-count federal indictment including charges of child pornography and using an interstate facility to attempt to persuade a person under eighteen years old to engage in a sexual act. On June 14, 1999, Volungus was sentenced to fifty-three months incarceration to be followed by three years of supervised release. He was incarcerated from July 1999 to May 2003 at the Federal Correctional Institution at Fort Dix, New Jersey. While in prison, Volungus kept in his prison locker a list of books about sexual acts with children and hand-drawn pornographic images depicting him having sex with children.

After these items turned up in a search of his locker, Volungus admitted to having "a problem and . . . [thinking] about sex with children all the time."

On April 12, 2004, when probation officers visited Volungus to install monitoring software on his computer as a condition of his supervised release, they discovered that, once again, Volungus had started downloading child pornography to his computer. He had downloaded images depicting prepubescent minors engaged in oral sex, intercourse, and lascivious exhibition. A few days later, Volungus acknowledged to his probation officer that "he had difficulty controlling his impulses" and had visited chat rooms called "Youth and Beauty." A later forensic examination of his computer also revealed that a file-wiping program had been run on Volungus's computer three days before the probation officers' arrival.

Volungus's probation officer increased his supervision and treatment activities, adding one-on-one psychological treatment to his sex offender treatment program, and Volungus seemed to be improving. The appearance of improvement ended in May 2005, when Volungus admitted that he had unsupervised contact with his five-year-old niece in violation of his supervised release conditions.[1] Volungus was subsequently arrested for violating the terms of his

---

[1]  An investigation of this matter by the New York Office of Children and Family Services concluded that there had been no abuse or maltreatment of the child.

release and stipulated to the three charged violations: engaging in criminal conduct by possessing child pornography, viewing and possessing child pornography, and having unauthorized contact with a minor. Volungus testified at his violation hearing that his treatment program "hasn't helped enough. I know that. . . . I have a problem controlling it . . . I really don't have enough control over it . . . ." His supervised release was revoked and he was sentenced to twenty-three months imprisonment followed by thirteen months of supervised release.

After Volungus's sentencing, authorities discovered letters Volungus had written to a man in Texas named Gary Gallardo, who had been arrested for possession of child pornography. The letters were written between March and April 2005, during Volungus's supervised release and while he was attending sex offender treatment classes. The letters contained graphic descriptions of various scenes of child pornography, as well as advice for procuring it. Additionally, the letters discussed Volungus and Gallardo's plans to travel to other countries for the purposes of having sex with children and producing child pornography. Some pertinent passages from the letters follow:

- Get YAHOO Messenger. Many good chat rooms where goodies are posted and traded. Watched some great vidz last night, including one of guys daughter – about 7, cute as hell and does one hell of a sexy striptease and pussy show. I gotta figure out how to save a webcam broadcast!

- Oh . . . Newsgroup for you to check out . . . You'll need a yenc decoder to see the goodies . . .

-6-

relief soon, and once I do, and once <u>you</u> are free to travel, we <u>have</u> to take a trip and fuck some girls . . . and video it!  Get a phone so I can call you!

- I took a trip to our local "red light" district, picked up a great girl . . . sucked the cum outta my nuts and ate it up.  She seemed to be a bit "high," so I figure I'm gonna work on her some more.  Betcha she's got kids, and if she needs a fix, I've got young pussy.

In late 2006, when Volungus's second term of incarceration was almost complete, he had a psychological evaluation with Bureau of Prisons Psychologist Dr. Ferraro to determine whether he should be civilly committed as a sexually dangerous person under the Adam Walsh Act.  Dr. Ferraro assessed Volungus as being at high risk to reoffend, prompting the government to initiate proceedings for civil commitment.

In August 2007, while the commitment proceedings were pending, the government found a sizeable file of documents among Volungus's belongings, which contained hundreds of articles about sex with minors, hand-drawn pictures of an adult male having sex with children, several pages with handwritten lists of graphic videos or pictures of young children performing explicit sexual acts,[2] notes on physical disguises and how to avoid detection when viewing child pornography, notes making reference to "lovers' rights" and NAMBLA (North American Man-Boy Love Association), and

---

[2]  This list included items such as the following entries: "boy about 5 fucks baby sis in backyard," "Video of 4 girls getting fucked–youngest is about 6 or 7 oldest about 12," and "girl about 8 getting cherry busted hot."

slogans like "sex before eight or else it's too late!" A substantial number of the materials in the file bore dates suggesting that Volungus acquired them while his civil commitment proceeding was pending.

Before his civil commitment hearing, Volungus was also evaluated by several experts to determine whether he should be committed as a "sexually dangerous person." These experts reached varying conclusions on Volungus's risk of sexual recidivism using a variety of actuarial instruments and tests.[3] Volungus's own account of his sexual history has also varied over time. When speaking to a defense expert, he claimed to have had around 50 sexual partners, and when speaking to a government expert, Volungus put the number closer to 200. Volungus has also denied having sex with anyone younger than eighteen when speaking with examining psychologists and criminal investigators, but he has bragged about his sexual exploits with young teenagers and adolescents in internet chat rooms.

On March 8, 2012, after a seven-day evidentiary hearing, the district court determined that the government had proved by clear and convincing evidence that Volungus suffered from

---

[3] Specifically, Dr. Ferraro of the Bureau of Prisons concluded Volungus had a "high" risk of recidivism, Volungus's experts testified that he had a "moderate-high" or "low-moderate" risk, while Dr. Phenix -- the government's expert -- testified first that he had a "moderate-high" risk and later a "high" risk, although using different instruments, he placed Volungus at "low," "low-moderate," or "moderate" risk of recidivism.

pedophilia, a mental disorder, which impaired his ability to refrain from deviant sexual behavior and would cause Volungus to have serious difficulty in refraining from child molestation. In so holding, the court phrased the question before it as whether Volungus's pedophilia impaired his volitional control such that he would have serious difficulty refraining from child molestation if released. The court recognized that the government had not proved any actual or attempted child molestation offenses aside from Volungus's attempt with "Sarah." Still, it concluded that Volungus was so driven by his "obsessional impulses" with child pornography and the idea of performing sexual acts with minors, that he would be unable to control his pedophilia and limit it to private masturbation sessions at his home.

## II. Discussion

### A. Standard of Review

We review the district court's findings of fact for clear error and its conclusions of law de novo. United States v. Shields, 649 F.3d 78, 89 (1st Cir. 2011). Where, as here, the district court has applied a general standard of law to specific facts, we give some deference to the fact-finder. Id. at 89; United States v. Carta, 592 F.3d 34, 39 (1st Cir. 2010). Moreover, under our clear error review, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, [we] may not reverse it," even if we would have weighed

the evidence differently had we been the trier of fact.  <u>Anderson</u> v. <u>Bessemer City</u>, 470 U.S. 564, 573-74 (1985).

**B. The Adam Walsh Act**

We begin with a brief examination of the purpose of the Adam Walsh Act.  The Act was enacted in 2006 "[t]o protect children from sexual exploitation and violent crime."  Pub. L. No. 109-248, 120 Stat. 587 (2006).  To further this goal, the Act amends and supplements existing civil commitment provisions to allow the federal government to seek court-ordered civil commitment of certain sexually dangerous persons in custody.  <u>See</u> <u>id.</u> § 302 (codified at 18 U.S.C. §§ 4241, 4247, 4248).

The Act vests the Attorney General, any person authorized by the Attorney General, or the Director of the Bureau of Prisons with the power to certify that an individual in custody is a "sexually dangerous person."  <u>Id.</u> § 4248(a).  This certification is then transferred to the district court which must order a hearing to determine whether the person is a "sexually dangerous person." <u>Id.</u>  At this hearing, the government bears the burden of demonstrating by clear and convincing evidence that the inmate is in fact a "sexually dangerous person," by showing that the individual: 1) has "engaged or attempted to engage in sexually violent conduct or child molestation," 2) "suffers from a serious mental illness, abnormality, or disorder," and 3) as a result of this disorder he "would have serious difficulty in refraining from

-11-

sexually violent conduct or child molestation if released."  Id.
§§ 4247(a)(5)-(6), 4248(d).  The Supreme Court has noted that the
clear and convincing evidence standard is an "intermediate
standard" somewhere "between a preponderance of the evidence and
proof beyond a reasonable doubt," Addington v. Texas, 441 U.S. 418,
425 (1979), requiring proof that the government's assertions are
"highly probable," Colorado v. New Mexico, 467 U.S. 310, 316-17
(1984).

## C. Sexual Dangerousness

On appeal, Volungus does not contest the district court's
finding that the government presented clear and convincing evidence
to establish that he has attempted to engage in child molestation
and he suffers from a serious mental disorder, pedophilia.  Instead
his arguments focus on the third prong of the sexually dangerous
test, namely the court's conclusion that as result of his
pedophilia, Volungus would "have serious difficulty in refraining
from . . . child molestation if released."  Volungus maintains that
his commitment cannot rest only on his mental disorder and
fantasies about having sex with children.  He claims that he has
demonstrated an ability to refrain from molesting children, that he
is able to control his potential dangerousness, and that unlike
other individuals confined under the Adam Walsh Act, he has not

-12-

committed numerous "hands-on" offenses with children.[4]  As such, Volungus asserts that the district court erred by focusing on his predisposition to view child pornography and fantasize about having sex with children when it should have focused on the likelihood that he would commit future physical acts of molestation.

We find Volungus's arguments that the court erred unconvincing.  In our view, the district court possessed ample evidence to support a finding that Volungus's pedophilia would cause him serious difficulty in refraining from sexual violence or child molestation in the future.

Volungus has readily admitted, on multiple occasions, that he is unable to control his attraction to prepubescent children.  The district court reasonably concluded that this lack

---

[4]  Volungus also argues that he has not actually had any "hands-on" offenses as a result of his pedophilia, as the incident with "Sarah" involved a fourteen-year-old, non-prepubescent girl. Volungus claims that pedophilia only encompasses sexual desires and behaviors with prepubescent children (generally aged 13 and younger), and points out that all the experts agreed that his seeking out "Sarah" was not a manifestation of his "pedophilia." To the extent that Volungus argues that this makes him statutorily ineligible for commitment, we do not find his arguments persuasive. The second and third requirements for commitment under the Adam Walsh Act are directly linked (the statute requires a finding that an individual has a serious mental disorder, and as a result of this disorder, would have difficulty refraining from child molestation). However, the plain language of the statute indicates that the first requirement is completely independent, and imposes no precondition that the predicate offense have occurred as a result of the respondent's disorder. 18 U.S.C. § 4248(a)(5)-(6). As such, regardless of whether Volungus's offense with "Sarah" resulted from his pedophilia, we hold it was sufficient to satisfy the statute's first requirement.

of volitional control was clearly evidenced by the fact that Volungus -- while on supervised release, the very time he was most likely to be caught -- downloaded large amounts of child pornography, had prohibited contact with his niece, and wrote graphic letters to a fellow pedophile about his plans to engage in sexual acts with children.  The court possessed proof that either Volungus's sex offender treatment was not working or that he was not participating in it sincerely; Volungus was actively downloading child pornography and communicating with a fellow pedophile about having sex with children and producing child pornography while he was attending treatment sessions.  Moreover, Volungus, while on supervised release, continued his attempts to contact minor females by visiting chat rooms similar to the one in which he met "IndyGirl."  The district court reasonably found that such attempts to contact minors took Volungus a step beyond passive consumption of child pornography and into the realm of affirmative encounters with minors.[5]

Additionally, the district court found that Volungus suffered from a "long and persistent trajectory of obsession" with child pornography and sex with children.  Volungus obsessively viewed and downloaded child pornography, masturbated to it, then

---

[5]  The district court was careful to limit its finding, noting that Volungus's attempts to contact minors like "facialgirl," while an "affirmative encounter," did not qualify as a "hands-on" offense of actual or attempted child molestation.

used the internet to seek real child victims.  Indeed, Volungus's attempt to meet "Sarah" for sex, his chats with "facialgirl," whom he  believed to be a fourteen-year-old female, and his reported conversations with a man in Canada about meeting the man's eight-year-old daughter for sex can all be viewed as manifestations of this "trajectory" which culminated in Volungus's conviction for attempted molestation.[6]  The district court also noted the speed with which Volungus moved from what he claimed was his first introduction to child pornography in the Spring of 1998 to his attempted molestation of "Sarah" just a few months later in August of 1998.  The evidence suggested that Volungus could not break this cycle, as shortly after he began supervised release, he once again began downloading child pornography and visiting chat rooms like "Youth and Beauty."  Accordingly, we find that the court had a reasonable basis for concluding that Volungus's continuing behavior of obsessive downloading and viewing of child pornography and seeking online contact with children would cause him serious difficulty in refraining from child molestation in the future.

To the extent that the court valued the opinion of the government's witness, Dr. Phenix, who testified that Volungus's

---

[6]  In our analysis, we do not treat Volungus's online behavior as actual or attempted child molestation under the statute.  However, we do consider this conduct, alongside Volungus's other actions, as relevant to the district court's proper determination of Volungus's sexual dangerousness.  Here, these interactions demonstrate Volungus's efforts to seek out real children for sex after downloading and viewing large amounts of child pornography.

pedophilia presented such a volitional impairment that he would have serious difficulty refraining from molestation, over that of the other experts who testified that he could refrain from molestation, we find no error. See Shields, 649 F.3d 78, 90 (1st Cir. 2011) (holding where two testifying experts "interpreted [respondent's] child pornography offense as a sign of ongoing deviance rather than improved impulse control . . . it was entirely reasonable for the court to credit their testimony over [his] expert's opinion"). It is not our place to re-weigh the credibility of witnesses, United States v. Hahn, 17 F.3d 502, 508 (1st Cir. 1994), or to determine the weight accorded to expert witness, Seahorse Marine Supplies, Inc. v. Puerto Rico Sun Oil Co., 295 F.3d 68, 81 (1st Cir. 2002).

Volungus's challenge to the district court's findings emphasizes the fact that his criminal history includes a single "hands-on" offense, attempted child molestation, dated more that ten years ago.[7] He also directs us to expert testimony that he might have serious difficulty refraining from viewing child pornography but would not have such difficulty in refraining from

_____

[7] Additionally, Volungus makes much of a list of cases where respondents were civilly committed under the Act after they had committed numerous contact offenses, which he contrasts with his single attempted molestation conviction. However, this is not persuasive evidence that Volungus himself should not be committed. Indeed, these cases only demonstrate that individuals with lengthier records than Volungus have been committed under the Act, not that those in similar circumstances to Volungus are ineligible for commitment.

child molestation. We cannot, however, state that the court clearly erred by placing more weight on the evidence of Volungus's sexual obsession and the limitations on his volitional control. United States v. Batista-Polanco, 927 F.2d 14, 17 (1st Cir. 1991) (it is ultimately the responsibility of the factfinder to "decide among reasonable interpretations of the evidence"). Given Volungus's history, failed treatment, correspondence with Gallardo, and inability to abstain from sexually deviant behaviors at the very moments when he was most likely to get caught, we believe the determination that he lacked volitional control is well supported by a reasonable interpretation of the evidence.

Ultimately, while actual or attempted child molestation offenses may be telling evidence of just how sexually dangerous an individual is, this is not the only type of evidence that speaks to this trait. We are of the opinion that sexual dangerousness requires an individualized determination that cannot rest solely on the number of offenses committed or the timing of those offenses. A court could reasonably conclude that an individual who has committed multiple offenses but successfully completed a rehabilitation program may be less dangerous than someone who has committed one offense but exhibits a perpetual desire or propensity to commit more offenses, even while in treatment.

In this case, the district court reasonably concluded that Volungus either made little effort to sincerely engage in a

sex offender treatment program or that the treatment program was ineffective. Volungus went as far as to discuss planning trips to have sex with children with another pedophile while undergoing this treatment. He continued to collect or draw child pornography even while on supervised release and in custody. He also had unsupervised contact with a five-year-old in violation of the terms of his supervised release. The evidence supports the district court's conclusion that Volungus may have been convicted of a single attempted molestation offense, but his obsession with child pornography, his desire to have sex with children, and his willingness to seek out children online have persisted without any interruption or signs of improvement. In light of these circumstances, we cannot find that the district court clearly erred in determining that Volungus was a sexually dangerous person subject to commitment.

### III. Conclusion

Finding no error in the district court's factfinding or legal conclusions, we **affirm** Volungus's commitment order in its entirety.

So ordered.