# United States Court of Appeals
## For the First Circuit

No. 20-1009

UNITED STATES OF AMERICA,

Petitioner, Appellee,

v.

WAYNE HUNT,

Respondent, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

Before

Thompson and Kayatta, Circuit Judges,
and Katzmann,[*] Judge.

Ian Gold for appellant.
Jennifer A. Serafyn, Assistant United States Attorney, with
whom Nathaniel R. Mendell, Acting United States Attorney, was on
brief, for appellee.

December 17, 2021

    [*] Of the United States Court of International Trade, sitting
by designation.

**KAYATTA**, **Circuit Judge**.  In 2009, Wayne Hunt became one of the first people to be civilly committed under the Adam Walsh Child Protection and Safety Act of 2006, Pub L. No. 109-248, 120 Stat. 587 (2006) ("Adam Walsh Act"), which authorizes additional civil commitment of someone already in federal custody if the government shows that he is a "sexually dangerous person."  18 U.S.C § 4248.  In 2012, Hunt was discharged from this commitment under conditions, including that he receive mental health treatment and supervised probation.

The Adam Walsh Act also provides a path to <u>un</u>conditional discharge upon a showing that the committed individual would not be "sexually dangerous to others" if so released.  18 U.S.C. § 4248(e)(1).  In 2018, Hunt moved for an unconditional discharge,[1] thereby initiating the proceedings leading to the instant appeal.  After a hearing in October 2019, the district court found that, while it was a close question, Hunt had failed to make the required showing.  The court did eventually remove many of his conditions, including those requiring treatment.  Hunt argues on appeal that the court erred in denying his unconditional

---

[1]  Hunt's motion for unconditional discharge was occasionally referred to below as a "petition."  However, the United States is stylized as the "petitioner" in the case caption because this appeal is part of the larger civil action that commenced with the government's initial action in 2007 to have Hunt committed. Accordingly, we refer to Hunt's filing as a "motion" throughout this opinion to avoid confusion.

discharge motion and that the statute compels his discharge in the absence of any remaining treatment conditions. For the reasons that follow, we find no reversible error in the district court's decision.

## I.

## A.

Wayne Hunt is an admitted pedophile who, decades ago, engaged in sexual acts with dozens of children as young as seven from the time he was twenty-seven years old. United States v. Hunt, 643 F. Supp. 2d 161, 162, 164-66 (D. Mass. 2009). He has been convicted of multiple state and federal crimes stemming from this conduct, including aggravated rape and the kidnapping of a twelve-year-old boy. Id. at 165-66. He committed his last offense in 1985 and was most recently imprisoned for his crimes between 1985 and 2007. Id. at 165-67.

As Hunt was approaching the end of his prison sentence, the Bureau of Prisons (BOP) certified him under the Adam Walsh Act as a "sexually dangerous person," which the Act defines as "a person who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others."[2] 18 U.S.C. § 4247(a)(5); Hunt, 643 F. Supp. 2d at 162,

---

[2] Hunt remained incarcerated between the end of his criminal sentence and the trial on his civil commitment, pursuant to the automatic stay provision of the Adam Walsh Act. See Hunt, 643 F. Supp. 2d at 162; 18 U.S.C § 4248(a).

167. That certification initiated the proceedings that culminated in the 2009 trial at which the government proved by clear and convincing evidence that Hunt was sexually dangerous to others. See Hunt, 643 F. Supp. 2d at 162. That finding led to his civil commitment at FCI Butner in North Carolina, where Hunt successfully participated in sex-offender-specific therapy for several years.

In 2012, Hunt moved for and was granted conditional release under a "prescribed regimen of medical, psychiatric, and psychological care," with the supervision of United States Probation ("Probation"). See 18 U.S.C. §§ 4247(h), 4248(e)(2). Altogether, Hunt was subject to thirty-two conditions in his initial discharge, which, beyond requiring the prescribed medical care, also limited his contact with minors and his use of computers, required regular polygraph examinations, and imposed a curfew. Since August 2012, he has lived at the New England Center for Homeless Veterans in Boston without any noted violations of these conditions. Throughout that time, Hunt has engaged in sex-offender therapy with Dr. John Cusack, starting with weekly individual sessions and a sex-offender group program, then transitioning to monthly individual sessions supplemented with monthly "maintenance/check-in" group meetings.

Hunt, now seventy-five years old, has been partially paralyzed from a medical condition. His limited mobility confines him to a wheelchair. He also contends with a partially collapsed

- 4 -

lung and a heart infection. To manage chronic nerve pain, he takes gabapentin, which he reports has also resulted in declining sexual functioning.

After almost six years of satisfying his conditions of release, Hunt moved in October 2018 for a hearing on his eligibility for unconditional discharge from commitment under the Adam Walsh Act. See 18 U.S.C. §§ 4247(h), 4248(e)(1). The government responded that the motion was "premature" but that it was "open to revisiting" Hunt's motion once he had completed treatment in early 2019. Accordingly, Hunt renewed his motion in March 2019 and asked the court to appoint his chosen examiner, Dr. Joseph Plaud, to perform a psychological examination and sex-offender risk assessment of him. See id. § 4247(b). The government opposed Hunt's renewed motion for unconditional discharge, and the district court permitted the appointment of Dr. Plaud, setting the stage for a hearing on the discharge motion.

**B.**

At the October 2019 hearing, the district court heard testimony from the appointed examiner, Dr. Plaud, and from Hunt himself. The court also received three documents into evidence: a summary of supervision by Probation, Dr. Plaud's report of his findings and opinion, and Dr. Plaud's CV. The government offered no evidence of its own.

- 5 -

**1.**

Probation's report largely credited Hunt's compliant behavior. It noted that Hunt had consistently worked with Dr. Cusack on his treatment regimen, and that he had progressed through several stages of the rehabilitation program over time. In addition to installing monitoring software on his laptop, Hunt has been subject to regular polygraph testing to monitor compliance. Probation documented no violations of his conditions. However, the report noted two incidents "worth mentioning": (1) Hunt had watched a non-pornographic movie titled "Slutty Summer" that required follow-up in his treatment and (2) Hunt had searched for sexual lubricants and "sexual toys" on Amazon. Hunt later explained that he had been searching for lubricant for medical reasons[3] and that this search "led him to look at sexual toys."

The report also discussed Hunt's "limited social support system," which includes regular contact with his daughter, who lives in upstate New York, and friendly interactions with other members of the veterans' home where he has resided since his release in 2012. The report observed that "[t]he probation office continues to be an ongoing support in Mr. Hunt's life and continues to provide him with face to face interactions to reinforce his

---

[3] Dr. Plaud's report noted that Hunt used a catheter.

positive progression." Hunt later acknowledged in his testimony that he had a good relationship with his probation officers, and he agreed that their involvement in his life was not "too onerous."

**2.**

Dr. Plaud, an expert in sex offender treatment, consulted Hunt's medical records, conducted a clinical interview, and discussed Hunt's treatment with his provider, Dr. Cusack. In the fourteen-page report admitted at Hunt's discharge hearing, Dr. Plaud diagnosed Hunt with pedophilic disorder based on Hunt's "history," but stressed that he found "no indication in the present tense, or going back in time multiple years, that there is recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children." Dr. Plaud concluded that Hunt was not a sexually dangerous person, and that his "offense risk level" at the time of the report in 2019 was "not in keeping with an individual who has serious difficulty in refraining from sexually violent conduct or child molestation if the conditions of his present supervised release are removed." Dr. Plaud also noted that these assessments were shared by Hunt's regular treatment provider, Dr. Cusack, whom he quoted as saying, "I couldn't have asked Mr. Hunt to do any better in the multiple years I've known him."

In his testimony, Dr. Plaud reinforced these conclusions. For example, he noted that while the diagnosis of

pedophilic disorder was compelled based on Hunt's history, "the strength of the diagnosis, is such, in Mr. Hunt's case today, that it's negligible," and "if there was a provision for remission [in the Diagnostic and Statistical Manual of Mental Disorders (DSM-V)], [he] would have found it most definitely in this case." On cross-examination, Dr. Plaud acknowledged that he did not undertake two specific exercises for empirically measuring sexual offense risk: a "penile plethysmograph" or "PPG" (a test that measures penile engorgement while viewing stimuli), and a "Static-99r" (an actuarial measurement).[4]

Later in the hearing, the district court engaged in a brief colloquy with Probation, which acknowledged Dr. Cusack's support for Hunt and agreed that Dr. Plaud's characterization of Dr. Cusack's opinions was "spot on."

Hunt then testified at length about his physical and mental condition, the progress he had made, and that he had learned how to experience empathy. Regarding his pedophilia, he said "[y]ou know, the first thing that you got to do is know that there's no cure. You've got to manage." He testified several times to his present lack of sexual desire and fantasies. The

---

[4] Dr. Plaud did not conduct the PPG because, in his judgment, it would have "flatlined," given Hunt's age and medical issues. He did not score a Static-99r because he believed the number would have been "invalid" and "meaningless" given Hunt's age and incident-free time in the community.

district court later noted that Hunt struck the court as "sincere and forthright, and honest, with a lot of insight," and the court was "persuaded that Mr. Hunt has progressed successfully, compared to when he was released."

**3.**

Nonetheless, in an oral decision issued at the hearing, the district court found that Hunt had not met his burden to show that he would not be sexually dangerous to others if released unconditionally. The court therefore denied his motion for unconditional discharge. At the same time, the court indicated it would be open to lifting many of Hunt's conditions. The district court primarily based its decision on: (1) Hunt's testimony that he continued to "manage[] this every day"; (2) Hunt's past offense conduct; and (3) a concern that the court was not sure how Hunt would act without the supervision and accountability that had been so helpful to him. The court acknowledged, though, that "[i]t is a difficult thing to . . . prove, when you're on supervision, that . . . you won't have serious difficulty when you're not." The court's decision expressly did not rely on the absence of the two tests that the government had asked Dr. Plaud about, though the court did note that it disagreed with Dr. Plaud about the usefulness of continued treatment for Hunt "once [he'd] learn[ed] the skills" to manage his behavior.

The district court also clarified at several points that it understood Hunt's conditions of release were on a tapering trajectory, and that it anticipated any remaining conditions would continue on that path. For example, the court noted that it had "delayed" the hearing[5] from Hunt's 2018 motion in part because of Hunt's planned transition to less frequent therapy. The court then concluded its oral decision by noting that Hunt was "doing very well. Tapering, in my oversight role, seems reasonable."

After the hearing, the court did lift many of Hunt's conditions. The remaining "less restrictive conditions" govern the logistics and routine details of Hunt's interactions with Probation, prohibit unsupervised contact with minors (absent authorization by Probation), bar Hunt from loitering around "places where minors congregate," require Hunt to submit to polygraph exams as requested by Probation, and require that Hunt notify Probation before travelling outside the district. The revised conditions do not include any requirement that Hunt participate in treatment.

**II.**

Under the Adam Walsh Act, the Bureau of Prisons may certify someone in its custody as a "sexually dangerous person,"

---

[5] This was the district court's terminology, though we note that the 2018 motion was actually denied without prejudice to refile.

who then, after a hearing and appropriate findings, may be civilly committed to the custody of the Attorney General. 18 U.S.C. § 4248(a), (d). A "sexually dangerous person" is someone "who has engaged or attempted to engage in sexually violent conduct or child molestation" and "is sexually dangerous to others," which in turn means the person: (1) "suffers from a serious mental illness, abnormality, or disorder"; and (2) as a result of such disorder, would have "serious difficulty in refraining from sexually violent conduct or child molestation if released." Id. § 4247(a)(5)-(6).

The Act also provides two paths for the "[d]ischarge" of a person who has been so committed.[6] Id. § 4248(e). First, if a court finds by a preponderance of the evidence that the person "will not be sexually dangerous to others if released unconditionally," it "shall order that [the person] be immediately discharged." Id. § 4248(e)(1). Alternatively, a court can conditionally release someone who would not be sexually dangerous "if released under a prescribed regimen of medical, psychiatric, or psychological care or treatment," and thus "order, as an explicit condition of release . . . treatment." Id. § 4248(e)(2). If someone is released conditionally under this provision, the

---

[6] The Act describes the substance of the discharge criteria in terms of a hearing after certification from the director of a facility housing a committed individual, 18 U.S.C. § 4248(e), though in another section it provides equivalent procedures and relief upon motion by the committed individual, regardless of whether the director has certified, id. § 4247(h).

court may modify or eliminate "the regimen of . . . treatment" after a hearing.  Id. § 4248(e)(2)(B).

In this context, we take a three-tiered approach to appellate review:  We review questions of law de novo, questions of fact for clear error, and "appl[ication of] a general standard to specific facts" with "some deference" to the court below. United States v. Carta, 592 F.3d 34, 39 (1st Cir. 2010) (citing United States v. Jahagirdar, 466 F.3d 149, 156 (1st Cir. 2006) (describing the standard for applying law to facts as "abuse of discretion")); see also United States v. Volungus, 730 F.3d 40, 46 (1st Cir. 2013) (citing Carta for the "some deference" formulation in discussing the Adam Walsh Act).

On appeal, Hunt asserts that the district court erroneously concluded he had failed to show he would not be sexually dangerous to others if released unconditionally.  He also contends that the Adam Walsh Act compels his complete discharge because there is no statutory basis for his continued supervision absent a condition of treatment.  We consider these two challenges in turn.

**A.**

We turn first to Hunt's challenge to the district court's finding that he had not shown he would not be sexually dangerous to others if released unconditionally.  The burden to make this showing by a preponderance of the evidence rests with Hunt.  See

United States v. Wetmore, 812 F.3d 245, 246 (1st Cir. 2016). He takes issue with both prongs of the "sexually dangerous to others" finding, namely: (1) whether he suffers from a "serious mental illness," and (2) whether he would have "serious difficulty in refraining from sexually violent conduct" if released unconditionally.

**1.**

The conditions that may constitute a "serious mental illness, abnormality, or disorder" are not "delimited by the consensus of the medical community." Carta, 592 F.3d at 39. "[O]ne will search § 4247(a)(6) in vain for any language purporting to confine the universe of qualifying mental impairments within clinical or pedagogical parameters," and, accordingly, "it has been left to the courts to develop the meaning of 'serious mental illness, abnormality, or disorder' as a legal term of art." United States v. Caporale, 701 F.3d 128, 136 (4th Cir. 2012) (citation omitted).

Here, the district court was persuaded that Hunt suffered from such an illness. The government argues that there is no "legitimate dispute" on this prong because all parties agree that Hunt has been diagnosed with pedophilic disorder. Cf. Carta, 592 F.3d at 40-41 (explaining that the umbrella condition "paraphilia," which includes pedophilia and other sexual fixations, constitutes a "serious mental illness" for purposes of

- 13 -

the Adam Walsh Act).  Hunt, however, argues that his disorder cannot be characterized per se as a "serious" one, because, as reported by Dr. Plaud, Hunt will always carry this diagnosis due to his history and the fact that the DSM-V does not include a provision for remission of his disorder.  Indeed, Dr. Plaud testified that the severity of the diagnosis in Hunt was "negligible."[7]

That may be so, but Hunt himself testified that this is a lifelong condition with "no cure" and that he "manage[d]" it every day.  The district court expressly relied on this testimony in reaching its final decision.[8]  The court also stated that it was not fully convinced by Dr. Plaud's assessment that continued treatment would have limited value for Hunt.  In light of these bases for the court's finding that Hunt's pedophilia was a serious mental illness, and the lack of an authoritative rubric for grading

---

[7]  Nonetheless, Dr. Plaud also testified, "I would say [Hunt] meets th[e serious mental illness] prong" of the test because of his diagnosis.  He reconciled this with his earlier testimony about the strength of the diagnosis by concluding:  "I would temper -- I'd give him half a point" for this prong.

[8]  We recognize that it is not entirely clear from the record for which element of the sexual dangerousness inquiry the district court invoked this testimony, but no party has argued that the court improperly cited it for the purposes of the "serious difficulty" prong, rather than for the "serious mental illness" prong.

the seriousness of one's illness, we defer to the district court's assessment of Hunt's condition.[9]

## 2.

Hunt's more substantial argument is that the district court erred in finding that he had failed to meet his burden to show that he would not have "serious difficulty in refraining from sexually violent conduct." 18 U.S.C. § 4247(a)(6). We have previously noted that "the question of . . . risk of future offense" for sexually dangerous persons is "by no means an easy one." United States v. Shields, 649 F.3d 78, 89 (1st Cir. 2011). That is no less true here, where even the government declined to argue below that Hunt had not met his burden. Nonetheless, the district court correctly observed that even if both parties were to agree that Hunt had met his burden, the court could find that was not so.

We are not in a position to reweigh afresh the evidence presented before the district court. Reviewing that court's decision with some deference, as we must, we cannot say that the court erred when it found that Hunt had not yet met his burden. The district court carefully considered Hunt's evidence about his treatment and his physical condition and noted that "[t]his is a

_____

[9] Because of the difficulties of drawing lines around the severity of particular diagnoses, arguments about the severity of a given case may be better directed to the second prong of sexual dangerousness, regarding volitional control.

- 15 -

close and difficult case." It often expressly credited Hunt's progress and his candor before the court. We do have some concern that, despite this consideration, the district court gave seemingly little weight to Hunt's physical impairments in its ultimate ruling. That being said, the court placed decisive weight on the difficulty of determining whether Hunt's spotless record and success was dependent in part on the conditions that he sought to remove. Unconvinced on this point, the district court opted for a "tapering" approach, eliminating many of the conditions, including further mandatory treatment, but leaving in place for the moment conditions concerning Hunt's beneficial relationship with Probation.

We agree with the district court that this is a close call. But given the statute's placement of the burden on Hunt and the deference we must give to the district court's fact-finding, we are unable and unwilling to second guess the district court's conclusion. In so deciding, we note that no party disputes that Hunt can now renew his motion for release from the remaining conditions. See 18 U.S.C. §§ 4247(h), 4248(e). As the issues here are fact-bound, and Hunt has now presumably been living under his tapered conditions for the past two years, nothing in this opinion should be construed to limit Hunt's future attempts to seek final release from all conditions. This is not a case where the imposition of conditions should be indefinitely self-

justifying.  To the contrary, the logic of the district court's tapering objective suggests that, absent evidence of any backtracking, Hunt should now be well-positioned to renew his request.

**B.**

Hunt's remaining argument is that the removal of his treatment conditions in the district court's latest modifications renders his continued supervision contrary to statute.  In short, he argues that once the court found that treatment was no longer necessary, it lacked the statutory authority to impose any other conditions.

Hunt never raised this argument below.  Indeed, when informed of the court's decision and invited to make a further filing, Hunt preserved only his contention that he was not a "[s]exually [d]angerous [p]erson" and thus should be subject to no conditions at all.  Had Hunt raised the textual argument that he now raises, it is not at all clear what the effect would have been, given the district court's apparent reliance on Hunt's representations that he would continue treatment.  On appeal, Hunt concedes that how best to read the statute on this point is not "pellucid."  Hence, even were we to give Hunt the benefit of plain error review, we would find here that Hunt has not established that he would have secured a more favorable result had he raised the argument.  That said, nothing in this opinion should be read

to foreclose the district court's consideration of this argument in future proceedings, should it have occasion to do so.

### III.

For the foregoing reasons, the district court's decision denying Hunt's motion for unconditional discharge is **affirmed**.